# United States Court of Appeals
# for the District of Columbia Circuit

## Nos. 24-7045 & 24-7148

DAVID L. DE CSEPEL; ANGELA MARIA HERZOG; JULIA ALICE HERZOG,

*Plaintiffs-Appellants,*

*v.*

REPUBLIC OF HUNGARY, a foreign state; HUNGARIAN NATIONAL GALLERY; MUSEUM OF FINE ARTS; MUSEUM OF APPLIED ARTS; BUDAPEST UNIVERSITY OF TECHNOLOGY AND ECONOMICS; MAGYAR NEMZETI VAGYONKEZELŐ ZRT., MNV or Hungarian National Asset Management Inc. in English,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:10-cv-01261-JDB, Honorable John D. Bates, U.S. Senior District Judge.*

# APPELLANTS' MOTION TO VACATE THE PANEL DECISION AND REMAND, OR ALTERNATIVELY FOR SUPPLEMENTAL BRIEFING, AND TO WITHHOLD THE MANDATE

SHERON KORPUS
AMIT R. VORA
ALYCIA REGAN BENENATI
KASOWITZ LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
skorpus@kasowitz.com
avora@kasowitz.com
abenenati@kasowitz.com

*Counsel for Plaintiffs-Appellants*

April 15, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................i

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ............................................................................................... 4

ARGUMENT ..................................................................................................... 8

I.  The 2025 HEAR Act Supplies Jurisdiction for Plaintiffs'
Claims under the Expropriation Exception to the FSIA. ..................... 8

A.  The 2025 HEAR Act Reflects Successful Interbranch
Coordination............................................................................ 8

B.  The 2025 HEAR Act Invalidates the Jurisdictional
Predicates of the District Court's and the Panel's
Decisions. .............................................................................. 13

1.  The 2025 HEAR Act Abrogates the Domestic-
Takings Rule as Applied................................................ 13

2.  The 2025 HEAR Act Abrogates the Distinction
Between Wartime and Peacetime Nazi-Era
Takings. ........................................................................ 15

3.  The 2025 HEAR Act Additionally Abrogates Any
Remaining Jurisdictional Barriers. ............................... 16

C.  The 2025 HEAR Act Is Retroactive and Applies to
Plaintiffs' Claims Because They Are Pending on Appeal.......18

II.  This Court Should Vacate the Panel Decision and Remand with
Specific Instructions, or Alternatively Order Supplemental
Briefing..............................................................................................19

III.  If Necessary, This Court Should Withhold Issuing the Mandate. .....21

CONCLUSION ................................................................................................22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alphin v. Henson*,
 552 F.2d 1033 (4th Cir. 1977) ................................................................19

*Bank Markazi v. Peterson*,
 578 U.S. 212 (2016)........................................................12, 13, 15, 18

*Boumediene v. Bush*,
 553 U.S. 723 (2008) ..............................................................................11

*Cicippio-Puleo v. Islamic Republic of Iran*,
 353 F.3d 1024 (D.C. Cir. 2004)..............................................................11

*Federal Republic of Germany v. Philipp*,
 592 U.S. 169 (2021)....................................................................2, 4, 5, 9

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
 721 F.3d 1330 (Fed. Cir. 2013) .............................................................19

*Ivanenko v. Yanukovich*,
 995 F.3d 232 (D.C. Cir. 2021)..................................................................5

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
 523 U.S. 26 (1998)................................................................................16

*Mistretta v. United States*,
 488 U.S. 361 (1989)...............................................................................11

*Patchak v. Jewell*,
 828 F.3d 995 (D.C. Cir. 2016)...............................................................19

*Plaut v. Spendthrift Farm, Inc.*,
 514 U.S. 211 (1995)...............................................................................18

*de Rodulfa v. United States*,
 461 F.2d 1240 (D.C. Cir. 1972)..............................................................19

*SEC v. Hallam,*
  42 F.4th 316 (5th Cir. 2022) ..................................................................19

*In re Terrorist Attacks on Sept. 11, 2001,*
  134 F. Supp. 3d 774 (S.D.N.Y. 2015) ....................................................12

*United States v. DeFries,*
  129 F.3d 1293 (D.C. Cir. 1997)..............................................................18

**Statutes and Rule**

22 U.S.C. § 1621 note ......................................................................8, 9

28 U.S.C. § 1605(a)(3)........................................2, 4, 9, 10, 14, 15

The HEAR Act of 2025, Pub. L. No. 119-82 ..... 1, 3, 8, 9, 10, 13, 14, 15, 16, 17, 18

Fed. R. App. P. 27 ...................................................................................1

Under Fed. R. App. P. 27, Plaintiffs–Appellants David L. de Csepel, Angela Maria Herzog, and Julia Alice Herzog move this Court to (i) vacate the panel's judgment and opinion of January 23, 2026, and remand this case to the U.S. District Court for the District of Columbia for proceedings consistent with the Holocaust Expropriated Art Recovery ("HEAR") Act of 2025, and with instructions that jurisdiction under 28 U.S.C. § 1605(a)(3) is established; or alternatively to (ii) order supplemental briefing on the Act's effect on this case. In addition, to the extent the pending en banc petition is resolved before this motion is resolved, Plaintiffs move this Court to withhold issuing the mandate during the pendency of this motion and corresponding appellate proceedings.

Plaintiffs' counsel contacted Defendants' counsel about their position on this motion. As of this motion's filing, Defendants' counsel has not responded. This motion is the first time that Plaintiffs have moved for the relief requested herein.

## PRELIMINARY STATEMENT

The 2025 HEAR Act, Pub. L. No. 119-82, which became law on April 13, 2026, vitiates the legal framework underlying the panel's decision affirming the dismissal of Plaintiffs' claims against Defendants–Appellees, Hungarian institutions, for lack of jurisdiction under the Foreign Sovereign Immunities Act

("FSIA"). (*See* Ex. A.[1]) The FSIA immunizes foreign states from liability in our courts unless the suit falls into a statutory exception. Plaintiffs' claims arose from Hungarian officials' and their Nazi collaborators' theft of artwork—the Herzog Collection of Plaintiffs' predecessors, Hungarian Jewish art collectors—during and after World War II. Plaintiffs thus pleaded that their claims satisfied the expropriation exception to the FSIA, which permits cases "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). As this case—which Plaintiffs brought as a federal action in 2010—was making its way through non-merits motions to dismiss and appeals, the Supreme Court decided *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 187 (2021), which adopted the domestic-takings rule: a nation's theft of its own citizens' property is a domestic matter, not an international one, and cannot satisfy the expropriation exception.

Seizing on *Philipp*, Defendants moved to dismiss on the ground that Plaintiffs' claims were jurisdictionally barred because they arose from Hungarian officials' theft of Hungarian citizens' property. Plaintiffs countered that their claims survived *Philipp* because they had pleaded that German Nazi officials had collaborated in the theft. The district court agreed with Defendants that Plaintiffs

---

[1] Because the Act has not been assigned a number in the U.S. Statutes at Large, this motion cites the "2025 HEAR Act."

had not shown enough German Nazi involvement to save the case from the domestic-takings bar. The panel affirmed the dismissal. (*See* Ex. B.)

In the 2025 HEAR Act, however, Congress has abrogated the domestic-takings rule for Nazi-era expropriation claims. Congress expressly noted *Philipp* and provided that a claim to recover artwork lost during the "covered period"—from 1933 to 1945—because of "Nazi persecution" "shall be deemed to be an action in which rights in violation of international law are in issue for purposes of [28 U.S.C. § 1605(a)(3)], without regard to the nationality or citizenship of the alleged victim." 2025 HEAR Act § 2(b). Congress also provided that the Act applies to claims—like Plaintiffs' claims—"pending on appeal." *Id.* § 6(b)(1).

In enacting these provisions, Congress heeded the panel's guidance. The panel observed that the judiciary could not remedy the "historic wrongs" that Plaintiffs and others have suffered "[u]nless and until Congress … grant[s] U.S. courts the jurisdiction to provide" the "justice" they "deserve." (Op. 33.) Congress has done precisely that. Not only has the Act overturned the jurisdictional framework under which the courts and parties have operated since 2021, but the Act has "deemed" Plaintiffs' claims jurisdictionally actionable as a matter of law under the expropriation exception to the FSIA. Because this intervening change in controlling authority extinguishes the jurisdictional predicates of the district court's and the panel's decisions, vacatur and remand is the appropriate course.

**BACKGROUND**

Plaintiffs' predecessors were Hungarian Jewish art collectors who assembled a valuable art collection known as the Herzog Collection. (JA.24-7045 at 285–86.) During and after World War II, Hungarian officials and their Nazi collaborators looted the artworks as part of a wholesale campaign to plunder Jewish property. (*Id.* at 286, 296, 306.) In 2010, Plaintiffs brought claims in the U.S. District Court for the District of Columbia to recover the collection from Defendants, Hungary and Hungarian institutions. (*Id.* at 315–22.) Since then, as the district court summed, "courts have decided several motions to dismiss, some defendants have been dismissed and others have been added, [and] the case has been up to the Court of Appeals three times." (*Id.* at 2891.) The pending appeal is the fourth.

Although the FSIA generally precludes our courts from asserting jurisdiction over suits against foreign states, the expropriation exception permits suits "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). Plaintiffs' amended complaint urged that their claims satisfied this exception. (JA.24-7045 at 295.)

In 2021—after this case's third appeal—the Supreme Court held that the expropriation exception covered takings in violation of the "international law of expropriation," but not takings in violation of the international law of "human rights" or of "genocide." *Philipp*, 592 U.S. at 180. The Court further held that the

4

expropriation exception did not cover a foreign state's takings of its citizens' property because—under the domestic-takings rule of the international law of expropriation—"what a country does to property belonging to its own citizens within its own borders is not the subject of international law." *Id.* at 176; *see also id.* at 187 ("We hold that the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule.").

In *Philipp*'s wake, Defendants moved to dismiss Plaintiffs' claims concerning 27 artworks on the jurisdictional ground that Hungary's seizure of its citizens' property did not violate the international law of expropriation and therefore could not trigger the expropriation exception. In Defendants' telling, *Philipp*'s domestic-takings rule was the "law of the land," and the "factual record confirm[s] that, with limited exception, Hungarian officials seized the subject artworks from Hungarians inside Hungary." (JA.24-7045 at 2062.)

In opposing the motion, Plaintiffs argued that *Philipp*'s domestic-takings rule should not be construed to bar their claims, as German Nazis were involved in the takings. (*Id.* at 2424.) In advancing that argument and alternative arguments, Plaintiffs properly reconciled their claims with *Philipp*, which was settled law absent congressional intervention. *Cf. Ivanenko v. Yanukovich*, 995 F.3d 232, 239

(D.C. Cir. 2021) (rejecting FSIA argument "foreclosed by the Supreme Court's precedent"). But Plaintiffs never abandoned the theory of jurisdiction set forth in their amended complaint: that Hungarian officials *and* their Nazi collaborators looted the Herzog Collection. (JA.24-7045 at 286, 296, 306.)

The district court granted Defendants' motion, reasoning: "Defendants … presented substantial additional evidence with their motion to dismiss that only Hungarian officials were directly responsible for the takings." (*Id.* at 2897.) Therefore, of particular importance here, Defendants had expressly argued, and the district court had expressly found, that Hungarian officials were directly responsible for looting the Herzog Collection.

Although Defendants had declined to move to dismiss Plaintiffs' claim concerning a 28th artwork, the *Santa Barbara* sculpture, the district court encouraged Defendants to move to dismiss that claim, too; so they did, and the court granted that motion on the ground that German Nazis had stolen *Santa Barbara* during wartime and Plaintiffs had established only that peacetime takings violated the international law of expropriation. (JA.24-7148 at 381–84, 1005.)

On January 23, 2026, a panel of this Court affirmed the district court's judgment of dismissal. Under *Philipp*'s domestic-takings rule, the panel presumed that Plaintiffs' claims arising from Hungarian officials' misconduct were jurisdictionally barred. (Op. 5, 13–14, 17.)

The panel further held that Plaintiffs had failed to show that German Nazis' wartime takings of Hungarian citizens' property, as opposed to peacetime takings, violated the international law of expropriation—meaning that Plaintiffs' claims failed not only as to German Nazis' seizure of the *Santa Barbara*, but *a fortiori* as to the 27 other artworks no matter the level of German Nazi involvement. (Op. 23–24.) As the panel observed: "To the extent the heirs succeed on any of their theories of German responsibility, those artworks would then be in the same position as the *Santa Barbara* sculpture *vis-à-vis* the wartime-takings question." (Op. 24.) The panel also affirmed the district court's rejection of Plaintiffs' alternative argument that, to the extent their predecessors were *de facto* stateless, the domestic-takings rule does not apply. (Op. 25–29.) And the panel concluded:

> The Herzogs were innocent victims of war and genocide, some of the millions of people for whom no measure of justice has ever been granted. Their family heirlooms now hang on the walls of public institutions in Hungary that, to date, have shown no real interest in atoning for the depredations of that country's World War II–era government. The only question we face today, however, is not whether these plaintiffs deserve justice—they surely do—but whether Congress has granted U.S. courts the jurisdiction to provide it. As explained above, it has not. Unless and until it does, the responsibility for redressing such historic wrongs must lie elsewhere.

(Op. 33.)

On February 23, Plaintiffs timely filed a petition for rehearing en banc, presenting the following question: "whether the panel impermissibly narrowed

FSIA § 1605(a)(3) by drawing a Nazi-era wartime-peacetime distinction and by holding that Plaintiffs had not shown that Nazi wartime takings of foreign nationals' property, as opposed to such peacetime takings, qualify for the expropriation exception." (Pet. 3.) That petition remains pending.

On March 16, Plaintiffs informed the Court through a Rule 28(j) letter that, as of that day, the 2025 HEAR Act had passed both houses of Congress. The President signed the bill into law on April 13.

## ARGUMENT

**I.      The 2025 HEAR Act Supplies Jurisdiction for Plaintiffs' Claims under the Expropriation Exception to the FSIA.**

**A.      The 2025 HEAR Act Reflects Successful Interbranch Coordination.**

The 2025 HEAR Act amends the 2016 HEAR Act, 22 U.S.C. § 1621 note (i.e., a statutory note to title 22 ("Foreign Relations and Intercourse"), chapter 21 ("Settlement of International Claims"), section 1621 (setting forth definitions)). The 2016 Act preempted previous statutes of limitations and instituted a new six-year statute of limitations from the Act's passage for claims to recover Nazi-looted art. 22 U.S.C. § 1621 note § 5(a), (c).

The 2025 Act adds—after section 5, subsection (a) of the 2016 Act—the following: "Notwithstanding any other law or prior judicial decision, any civil claim or cause of action covered by subsection (a) *shall be deemed* to be an action

in which rights in violation of international law are in issue for purposes of section 1605(a)(3) of title 28, United States Code, *without regard to the nationality or citizenship of the alleged victim.*" 2025 HEAR Act § 2(b) (emphasis added).

The claims that section 5, subsection (a) covers are those "against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution." 22 U.S.C. § 1621 note § 5(a). The "covered period" is "the period beginning on January 1, 1933, and ending on December 31, 1945." *Id.* § 4(3); *see also* 28 U.S.C. § 1605(h)(3)(C). "Nazi persecution" is "any persecution of a specific group of individuals based on Nazi ideology by the Government of Germany, its allies or agents, members of the Nazi Party, or their agents or associates, during the covered period." 22 U.S.C. § 1621 note § 4(5).

The 2025 Act further amends the 2016 Act to state: "This Act also is intended to allow claims in accordance with the procedures under this Act for the recovery of artwork or other property lost during the covered period because, or as a result, of Nazi persecution, including by a covered government (as defined in section 1605(h)(3)(B) of title 28, United States Code) or an agent or associate of a covered government, regardless of the nationality or citizenship of the alleged victim, notwithstanding the 'domestic takings' rule under Federal Republic of Germany v. Philipp, 592 U.S. 169 (2021)." 2025 HEAR Act § 2(a)(1)(B).

A "covered government" is "(i) the Government of Germany during the

covered period; (ii) any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period; (iii) any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and (iv) any government in Europe that was an ally of the Government of Germany during the covered period." 28 U.S.C. § 1605(h)(3)(B).

In other words, Congress has answered the panel's call to "grant[] U.S. courts the jurisdiction" to redress the "historic wrongs" that Plaintiffs' predecessors and other victims have suffered. (Op. 33.) Under the Act's plain language, Plaintiffs' takings claims for all the at-issue artworks now satisfy the FSIA's expropriation exception and are jurisdictionally actionable.

More specifically, the FSIA's expropriation exception has two requirements: (1) "rights in property taken in violation of international law are in issue," and (2) a commercial nexus between the United States and the foreign defendants. 28 U.S.C. § 1605(a)(3). The 2025 HEAR Act satisfies the first requirement via statute, providing that claims within the Act's coverage "shall be deemed to be an action in which rights in violation of international law are in issue for purposes of [28 U.S.C. § 1605(a)(3)]." 2025 HEAR Act § 2(b). As a matter of law, where—as here—a plaintiff brings a civil claim against a defendant to recover artwork or other property that was lost between 1933 and 1945 because of Nazi persecution—

10

that is, persecution based on Nazi ideology by the German government or its allies—then the claim "shall be deemed" to satisfy the FSIA expropriation exception's first element and cannot be jurisdictionally barred on that ground, even if the victim was the defendant's citizen. As for the second element, as the panel observed: "All agree—and the record reflects—that the property at issue (the family's artwork) is owned by agencies or instrumentalities of Hungary that are sufficiently engaged in commercial activity in the United States." (Op. 5.) Therefore, both elements are satisfied for all the takings claims at issue.

"Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest." *Mistretta v. United States*, 488 U.S. 361, 408 (1989). And here, "ongoing dialogue between and among the branches of Government," *see Boumediene v. Bush*, 553 U.S. 723, 738 (2008), has worked in real time to resolve (i) Congress's concerns about the judiciary's interpretation of the expropriation exception as applied to Nazi-era expropriation claims, and (ii) the judiciary's concerns about the intended scope of Congress's expropriation exception. The next appropriate step in this constructive coordination is to vacate the panel decision and remand.

This is not the first time that Congress has intervened to guide the judiciary's interpretation of the FSIA. Far from it, Congress routinely course corrects FSIA cases, exercising its legislative power in an arena where its authority reaches its

11

apex: foreign affairs. After this Court held in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1036 (D.C. Cir. 2004), that neither the FSIA's terrorism exception nor a statutory amendment had created a private cause of action against a foreign state sponsor of terrorism, Congress created that right in 28 U.S.C. § 1605A. Similarly, after several decisions dismissed terrorism claims on the ground that the FSIA's tort exception required both the tortious act and the resulting injury to occur within the United States (*see, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774, 787 (S.D.N.Y. 2015), *vacated by* No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017)), Congress carved out an exception from this entire-tort rule in the Justice Against Sponsors of Terrorism Act, 28 U.S.C. § 1605B, which grants jurisdiction over foreign states for terrorism regardless of where the tortious act occurred.

The Supreme Court's decision in *Bank Markazi v. Peterson*, 578 U.S. 212 (2016), is particularly instructive. Congress had created a new standard for the FSIA's terrorism exception in 22 U.S.C. § 8772, which essentially clarified that "if Iran owns certain assets, the victims of Iran-sponsored terrorist attacks will be permitted to execute against those assets." *Id.* at 231–32. Although the Central Bank of Iran objected to Congress's attempt to target a discrete actor on a discrete topic—and, even more alarming to the bank, Congress's attempt to direct a particular result in a particular pending post-judgment enforcement proceeding—

the Court rejected those contentions and upheld the statute. *Id.* at 235–36. As the

Court reasoned, "it remains Congress' prerogative to alter a foreign state's

immunity and to render the alteration dispositive of judicial proceedings in

progress," *id.* at 236, and Congress may exercise its legislative power to "govern[]

one or a very small number of specific subjects," *id.* at 234. So too here, Congress

is comfortably operating within the sphere of its foreign-affairs powers in setting

forth new standards for courts as they apply the FSIA's expropriation exception to

Nazi-era takings claims. Nor is there anything objectionable about incorporating,

in real time, Congress's new rules into judicial proceedings in progress. Quite the

contrary, doing so is effective interbranch dialogue.

### B. The 2025 HEAR Act Invalidates the Jurisdictional Predicates of the District Court's and the Panel's Decisions.

#### 1. The 2025 HEAR Act Abrogates the Domestic-Takings Rule as Applied.

The 2025 HEAR Act abrogates *Philipp*'s domestic-takings rule for Nazi-era

expropriation claims. 2025 HEAR Act § 2(a), (b). Plaintiffs' claims arising from

Hungarian officials' misconduct therefore no longer face a jurisdictional bar on

that ground. The district court's and the panel's contrary premise—that Plaintiffs'

claims are jurisdictionally barred insofar as they allege that Hungarian officials

stole the artwork—cannot be squared with the Act. To the contrary, the district

court's own determination that "Defendants … presented substantial additional

evidence … that only Hungarian officials were directly responsible for the takings" (JA.24-7045 at 2897), coupled with the Act's text, confirms jurisdiction under the FSIA's expropriation exception over all the at-issue artworks. In light of the Act, the district court and the panel erred in holding otherwise.

The Act also renders flawed the district court's and the panel's holding faulting Plaintiffs for purportedly failing to make an adequate showing on the degree of German Nazi involvement. Litigating below and on appeal in *Philipp*'s shadow, Plaintiffs properly advanced one jurisdictional theory among others that their pleading supported and that Supreme Court precedent had not foreclosed: that German Nazi officials were involved in the takings. The Act, however, has transformed the jurisdictional landscape. Plaintiffs' allegations, claims, and evidence on Hungarian officials' misconduct are sufficient to establish jurisdiction over all the at-issue artworks, no matter the degree of German Nazi involvement.

Still more, the Act erases any remaining jurisdictional doubt over Plaintiffs' claims arising from Hungarian officials' misconduct insofar as the Act provides that the expropriation exception applies to "covered governments," a term that encompasses Nazi-era Hungary. 2025 HEAR Act § 2(a); 28 U.S.C. § 1605(h)(3)(B). Hungary was an ally of Germany and under German occupation during the covered period. (JA.24-7045 at 2914 ("[T]he Court has no doubt that Nazi Germany wielded substantial influence over Hungary over the course of the

14

German occupation—and plaintiffs have demonstrated as much.").)

<h3 style="text-align:center">2.     The 2025 HEAR Act Abrogates the Distinction Between Wartime and Peacetime Nazi-Era Takings.</h3>

Separately, the Act nullifies the district court's and panel's determination that Plaintiffs had not established jurisdiction under the FSIA's expropriation exception for certain claims insofar as they had shown only that Nazi-era peacetime takings, as opposed to Nazi-era wartime takings, violated the international law of expropriation. The judge-made distinction between Nazi-era wartime and peacetime takings, and the proposition that peacetime takings have a stronger jurisdictional claim to the FSIA's expropriation exception than wartime takings have, are no longer tenable. That is because claims for takings that resulted from "Nazi persecution" during "the covered period"—which spans from the beginning of 1933 to the end of 1945, thus including takings during World War II (the European theater of which concluded in May 1945)—"shall be deemed" to satisfy the FSIA expropriation exception's first element. *See* 2025 HEAR Act § 2(a), (b); 28 U.S.C. § 1605(h)(3)(C). Nazi-era takings, whether of the peacetime or the wartime variety, are the Act's focus, and under the Act's new standards— which "warrant[] respectful review," as Congress is exercising its "authority over foreign sovereign immunity," *see Bank Markazi*, 578 U.S. at 215, 236—both categories fall within the expropriation exception's jurisdictional ambit as a matter of law. Put differently, the Act eliminates the requirement that claimants

independently establish a violation of the international law of expropriation for HEAR-covered claims, instead deeming that requirement satisfied via statute for purposes of § 1605(a)(3). Indeed, in declaring that such a claim "shall be deemed" an action under the expropriation exception, Congress employed the strongest language in its statutory toolkit. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (observing that *shall* "normally creates an obligation impervious to judicial discretion").

More fundamentally, the Act is designed to disable judge-made distinctions that have impermissibly narrowed the expropriation exception and denied victims of Nazi persecution a merits determination on their claims. *Cf.* 2025 HEAR Act § 2(a) (providing that, because the Act's "purpose" is to "permit claims to recover Nazi-looted art to be resolved on the merits," "non-merits discretionary defenses" "must be precluded"). The district court's and the panel's judge-made distinction— that peacetime Nazi-era takings may satisfy the expropriation exception, whereas wartime Nazi-era takings may not—cannot survive the Act.

### 3. The 2025 HEAR Act Additionally Abrogates Any Remaining Jurisdictional Barriers.

The district court dismissed Plaintiffs' claim to the *Santa Barbara* in the alternative on forum non conveniens, concluding that the factors favored litigation in Hungary. (JA.24-7148 at 1005–08.) But the Act bars forum non conveniens as a basis for dismissing HEAR-covered claims. 2025 HEAR Act § 2(f)(2). Similarly,

16

the district court in an earlier decision dismissed claims to eleven artworks on international-comity grounds—a holding this Court reversed while affirming on other grounds. (Op. 11.) The Act forecloses future reliance on that rationale, prohibiting dismissal for "international comity." 2025 HEAR Act § 2(f)(2).

On the *In the Studio* painting, the panel affirmed dismissal because Plaintiffs' predecessor's 1959 claim to a U.S. claims commission had purportedly established the painting's taking at a date that either (i) triggered the domestic-takings bar or (ii) brought it within the scope of a 1973 Agreement that settled U.S. nationals' claims for pre-1973 takings. (Op. 32.) If the holding rests on the domestic-takings bar, the Act invalidates it. If the holding rests on the 1973 Agreement, that question may require proceedings on remand—but it should be addressed on a clean record, free from the jurisdictional defects the Act cured.

The panel also addressed whether Plaintiffs' predecessors' *de facto* statelessness during the Holocaust could satisfy the expropriation exception, holding that the protections of the international law of expropriation did not extend to *de facto* stateless persons. (Op. 25–29.) The Act invalidates that holding twice over: the deeming provision eliminates the need to independently establish a violation of the international law of expropriation, and the nationality-blindness provision permits jurisdiction "without regard to the nationality or citizenship of the alleged victim"—whether citizen, alien, or stateless. 2025 HEAR Act § 2(b).

**C. The 2025 HEAR Act Is Retroactive and Applies to Plaintiffs' Claims Because They Are Pending on Appeal.**

The 2025 HEAR Act applies to this case because the Act is expressly retroactive. By its terms, it "shall apply with respect to any civil claim or cause of action that is—pending in any court on the date of enactment of this Act, including any civil claim or cause of action that is *pending on appeal* or for which the time to file an appeal has not expired." 2025 HEAR Act § 6 (emphasis added). Plaintiffs' claims are "pending on appeal." *See United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (observing that the notice of appeal "confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal," and that the "district court does not regain jurisdiction over those issues until the court of appeals issues its mandate"). And in making the Act expressly applicable to claims such as Plaintiffs' that are "pending on appeal," Congress has ensured that the Act governs this appeal and supersedes the jurisdictional limitations the district court and the panel derived from prior law.

"When"—as here—"a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995); *see also Bank Markazi*, 578 U.S. at 215 ("Congress, our decisions make clear, may amend the law and make the change applicable to pending cases, even when the

amendment is outcome determinative."); *Patchak v. Jewell*, 828 F.3d 995, 1005 (D.C. Cir. 2016) ("[T]he legislature has the power to change the underlying laws applicable to a case while it is pending and, as a result, to alter the outcome of that case."), *aff'd sub nom. Patchak v. Zinke*, 583 U.S. 244 (2018); *de Rodulfa v. United States*, 461 F.2d 1240, 1253 (D.C. Cir. 1972) (holding that "until the appeal is disposed of," the judgment is not "unalterable by the legislature") (citation modified); *SEC v. Hallam*, 42 F.4th 316, 337 n.86 (5th Cir. 2022) (noting that when Congress "amend[s] the relevant statute" "before our mandate issued," the court has an "obligation" to "revisit[] the matter" and "review the judgment under the law as it currently exists") (citation modified); *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1346 (Fed. Cir. 2013) ("[A] new statute enacted *even after a final decision on appeal* is applicable in a pending case, so long as our mandate ending the litigation has not yet issued.") (emphasis added); *Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1977) ("[W]e should amend what we previously decided to make it conform to the law which now exists.").

This Court is accordingly required to apply the Act to this pending appeal, not only under the Act's express terms, but also under judicial precedent on both retroactivity and intervening changes in controlling law.

**II.     This Court Should Vacate the Panel Decision and Remand with Specific Instructions, or Alternatively Order Supplemental Briefing.**

Because the 2025 HEAR Act has invalidated the central premises of the

district court's dismissal and the panel's affirmance, the appropriate course is to vacate the panel's judgment and opinion and remand the case to the district court for proceedings consistent with the Act.

Moreover, this Court should remand with instructions that Plaintiffs' claims satisfy the FSIA's expropriation exception. As shown, Plaintiffs' claims satisfy the expropriation exception's two prongs: (i) HEAR-covered claims such as Plaintiffs' claims "shall be deemed to be an action in which rights in violation of international law are in issue for purposes of" 28 U.S.C. § 1605(a)(3); and (ii) as the panel confirmed, nexus is undisputed. *See supra* at 10–11. Consequently, no further jurisdictional proceedings are necessary, and remanding without instructions on this point would serve only to invite further litigation over a question Congress and this Court have jointly resolved. This case has generated multiple opinions and appeals over fifteen years, all on threshold barriers. The HEAR Act was enacted to end exactly that kind of procedural attrition. Remanding with instructions that jurisdiction is established gives effect to that purpose and allows the parties and the district court to turn, at last, to the merits.

Remanding with specific jurisdictional instructions is especially warranted because this Court reviews jurisdictional rulings under the FSIA de novo. (Op. 16.) The Act's effect on the expropriation exception presents a pure question of law that this Court is positioned to resolve. Remanding without instructions would defer a

20

legal question to the district court only for the question to return on another appeal.

As noted, Plaintiffs' en banc petition is pending. This motion's requested remedy of vacatur is broader than the en banc petition's requested remedy, which is to review and reverse the panel's holding distinguishing wartime and peacetime Nazi-era takings. Granting this motion would thus moot the en banc petition. In the interest of orderliness, Plaintiffs do not object to that outcome.

If this Court is not inclined to vacate the panel's decision at this time, Plaintiffs alternatively request that the Court order supplemental briefing on the 2025 HEAR Act's effect on this case.

## III.    If Necessary, This Court Should Withhold Issuing the Mandate.

Plaintiffs additionally request that this Court withhold issuing the mandate during the pendency of this motion and corresponding appellate proceedings. Plaintiffs make this request because, if this Court resolves the pending en banc petition during this motion's pendency, that decision will start the mandate clock.

To the extent this requested relief is necessary, there is good cause to grant it. Because the Court is required to apply the intervening statute to this pending appeal, issuing the mandate forthwith after deciding the en banc petition—and before resolving this motion—would risk effectuating a judgment premised on a congressionally displaced jurisdictional framework. Refraining from issuing the mandate preserves the Court's authority to implement the new law.

Plaintiffs ask only to withhold issuing the mandate during the pendency of this motion and corresponding appellate proceedings, a limited measure. And Defendants, for their part, cannot claim prejudice from a short pause that ensures that the Court applies the governing framework that Congress has made expressly retroactive to this very case status: "pending on appeal." Congress's power to change the applicable law while a case is pending—including to alter the outcome—further defeats any reliance interests that Defendants may claim in the mandate's imminent issuance under prior law. That is, since a judgment remains alterable until the appeal is disposed of, Defendants suffer no cognizable prejudice from maintaining the status quo to allow the Court to conform its decision to current law. *See supra* at 18–19.

**CONCLUSION**

This Court should: (i) vacate the panel's judgment and opinion and remand this case to the district court for proceedings consistent with the 2025 HEAR Act, and with instructions that jurisdiction under 28 U.S.C. § 1605(a)(3) is established; or alternatively (ii) order supplemental briefing on the 2025 HEAR Act's effect on this case. In addition, to the extent the pending en banc petition is resolved before this motion is resolved, this Court should withhold issuing the mandate during the pendency of this motion and corresponding appellate proceedings.

Dated:  April 15, 2026

Respectfully submitted,

/s/ *Alycia Regan Benenati*

**KASOWITZ LLP**

Sheron Korpus
  (D.C. Circuit Bar No. 53701)
Amit R. Vora
  (D.C. Circuit Bar No. 59926)
Alycia Regan Benenati
  (D.C. Circuit Bar No. 53684)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
skorpus@kasowitz.com
avora@kasowitz.com
abenenati@kasowitz.com

*Counsel for Plaintiffs–Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words.

2.    This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32 because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


/s/ *Alycia Regan Benenati*
Alycia Regan Benenati

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 15, 2026, I caused to be filed with the Court

through the CM/ECF system the foregoing motion with the Clerk of the Court for

the United States Court of Appeals for the D.C. Circuit using the appellate

CM/ECF system. Service was accomplished on the following counsel for

Defendants–Appellees by the CM/ECF system:

Adam Tarosky (D.C. Bar No. 983920)
NIXON PEABODY LLP
401 Ninth Street, N.W.
Suite 900
Washington, DC 20004
Tel: (202)-585-8000
Fax: (202)-585-8080
atarosky@nixonpeabody.com

Thaddeus J. Stauber
Aaron M. Brian
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Tel: (213) 629-6000
Fax: (213) 629-6001
tstauber@nixonpeabody.com
abrian@nixonpeabody.com

*Counsel for Defendants–Appellees*

/s/ *Alycia Regan Benenati*
Alycia Regan Benenati

# EXHIBIT A

S. 1884

# One Hundred Nineteenth Congress
## of the
## United States of America

**AT THE SECOND SESSION**

*Begun and held at the City of Washington on Saturday,*
*the third day of January, two thousand and twenty six*

## An Act

To clarify the Holocaust Expropriated Art Recovery Act of 2016, to appropriately limit the application of defenses based on the passage of time and other non-merits defenses to claims under that Act.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Holocaust Expropriated Art Recovery Act of 2025".

### SEC. 2. HOLOCAUST EXPROPRIATED ART RECOVERY ACT OF 2016 IMPROVEMENTS.

(a) IN GENERAL.—The Holocaust Expropriated Art Recovery Act of 2016 (22 U.S.C. 1621 note) is amended—

(1) in section 2—

(A) by redesignating paragraph (8) as paragraph (10);

(B) by inserting after paragraph (7) the following:

"(8) The intent of this Act is to permit claims to recover Nazi-looted art to be brought, notwithstanding the passage of time since World War II. Some courts have frustrated the intent of this Act by dismissing recovery lawsuits in reliance on defenses based on the passage of time, such as laches (for example, Zuckerman v Metropolitan Museum of Art, 928 F.3d 186 (2d Cir. 2019)) or adverse possession, acquisitive prescription, or usucapion (for example, Cassirer v. Thyssen-Bornemisza Foundation, 89 F.4th 1226 (9th Cir. 2024)) or on other non-merits discretionary defenses, such as the act of state doctrine (for example, Von Saher v Norton Simon Museum of Art at Pasadena, 897 F.3d 1141 (9th Cir. 2018)), forum non conveniens, international comity, or prudential exhaustion. In order to effectuate the purpose of the Act to permit claims to recover Nazi-looted art to be resolved on the merits, these defenses must be precluded.

"(9) This Act also is intended to allow claims in accordance with the procedures under this Act for the recovery of artwork or other property lost during the covered period because, or as a result, of Nazi persecution, including by a covered government (as defined in section 1605(h)(3)(B) of title 28, United States Code) or an agent or associate of a covered government, regardless of the nationality or citizenship of the alleged victim, notwithstanding the 'domestic takings' rule under Federal Republic of Germany v. Philipp, 592 U.S. 169 (2021)."; and

(C) in paragraph (10), as so redesignated, by striking "will yield just and fair resolutions in a more efficient

and predictable manner" and inserting "may, in some circumstances, yield just and fair resolutions as well";

(2) in section 3(2), by inserting "and other non-merits defenses" after "statutes of limitation";

(3) in section 5—

(A) by striking subsection (g);

(B) by redesignating subsections (e) and (f) as subsections (h) and (i), respectively;

(C) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively;

(D) by inserting after subsection (a) the following:

"(b) RELATION TO FOREIGN STATE IMMUNITIES.—Notwithstanding any other law or prior judicial decision, any civil claim or cause of action covered by subsection (a) shall be deemed to be an action in which rights in violation of international law are in issue for purposes of section 1605(a)(3) of title 28, United States Code, without regard to the nationality or citizenship of the alleged victim.";

(E) in subsection (d), as so redesignated, in the matter preceding paragraph (1), by striking "subsection (e)" and inserting "subsection (h)";

(F) in subsection (e), as so redesignated—

(i) in the matter preceding paragraph (1), by striking "Subsection (a)" and inserting "Subsections (a), (b), (f), and (g)"; and

(ii) in paragraph (2), by striking "during the period" and all that follows and inserting "on or after the date of enactment of this Act."; and

(G) by inserting after subsection (e), as so redesignated, the following:

"(f) DEFENSES BASED ON PASSAGE OF TIME AND OTHER NON-MERITS DEFENSES.—With respect to any claim that is otherwise timely under this Act—

"(1) all defenses or substantive doctrines based on the passage of time, including laches, adverse possession, acquisitive prescription, and usucapion, may not be applied with respect to the claim; and

"(2) all non-merits discretionary bases for dismissal, including the act of state doctrine, international comity, forum non conveniens, prudential exhaustion, and similar doctrines unrelated to the merits, may not be applied with respect to the claim.

"(g) NATIONWIDE SERVICE OF PROCESS.—For a civil action brought under subsection (a) in any State or Federal court, process may be served in the judicial district where the case is brought or any other judicial district of the United States where the defendant may be found, resides, has an agent, or transacts business."; and

(4) by adding at the end the following:

**"SEC. 6. SEVERABILITY.**

"If any provision of this Act, or the application of a provision of this Act to any person or circumstance, is held invalid, the remainder of this Act, and the application of such provision to other persons and circumstances, shall not be affected thereby.".

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any civil claim or cause of action that is—

(1) pending in any court on the date of enactment of this Act, including any civil claim or cause of action that is pending on appeal or for which the time to file an appeal has not expired; or

(2) filed on or after the date of enactment of this Act.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*

# EXHIBIT B

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 8, 2025          Decided January 23, 2026

No. 24-7045

DAVID L. DE CSEPEL, ET AL.,
APPELLANTS

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

———

*Alycia Regan Benenati* argued the cause for appellants. With her on the briefs were *Sheron Korpus* and *David E. Mills*.

*Aaron M. Brian* argued the cause for appellees. With him on the brief were *Thaddeus J. Stauber* and *Zachary C. Osinski*. *Adam R. Tarosky* entered an appearance.

2

———

No. 24-7148

DAVID L. DE CSEPEL, ET AL.,
APPELLANTS

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

———

*Alycia Regan Benenati* argued the cause for appellants.
With her on the briefs was *Sheron Korpus*. *David E. Mills*
entered an appearance.

*Aaron M. Brian* argued the cause for appellees. With him
on the brief were *Thaddeus J. Stauber* and *Zachary C. Osinski*.
*Adam R. Tarosky* entered an appearance.

Before: PILLARD and PAN, *Circuit Judges*, and ROGERS,
*Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

3

PILLARD, *Circuit Judge*:    These related appeals call on us to consider, for the fourth time, a family's decades-long effort to recover artwork that the Hungarian government and its Nazi collaborators seized from it during and following World War II. The historical context for this dispute is the campaign of annihilation unleashed on Hungary's Jews following that country's occupation by Nazi Germany in 1944, mere months before the end of the war in Europe. In less than a year, more than two-thirds of Hungary's prewar Jewish population was murdered, most of them at Auschwitz, in what Winston Churchill described as "one of the greatest and most horrible crimes ever committed." Jewish property, meanwhile, was seized by Hungarian and German authorities and redistributed across Europe—the spoils of a regime of state-perpetrated genocide.

This litigation is one of many suits brought by descendants of the victims of the Hungarian Holocaust seeking to recover their seized property. The narrow legal question we confront in these appeals is whether claims regarding any of the stolen artwork at issue are actionable in U.S. courts under the Foreign Sovereign Immunities Act's expropriation exception. Our circuit has grappled with aspects of that question since the outset of this suit fifteen years ago, and the intervening doctrinal clarifications have proved challenging for the family's claims. On remand from our third decision in this case, the district court, in two related decisions, dismissed this case entirely. Separate judgments generated two appeals, which we consolidated here for oral argument and decision.

For the reasons explained below, we hold that U.S. courts lack jurisdiction over the family's claims. Plaintiffs have the burden to establish that their artwork was taken in violation of the international law of expropriation. They have not done so. No international authorities of which we have been made aware

4

support plaintiffs' assertions that a nation-state's taking of property either from a foreign national during a wartime military occupation or from a *de facto* stateless person violates the international law of expropriation as it stood when the FSIA was enacted. And, as to two paintings that the family recovered after the war but that Hungary retook in the postwar period, the domestic-takings rule and a preexisting treaty prevent us from exercising jurisdiction. We therefore affirm the judgments of the district court.

## I.

## A.

The Foreign Sovereign Immunities Act (FSIA) provides ''the sole basis for obtaining jurisdiction over a foreign state in our courts.'' *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see* 28 U.S.C. § 1602 *et seq*. Absent a preexisting agreement between the United States and a foreign state, the FSIA precludes jurisdiction over suits against a foreign state—or its agents or instrumentalities— unless an exception applies. *Republic of Hungary v. Simon* (*Simon IV*), 604 U.S. 115, 118 (2025); *see* 28 U.S.C. §§ 1604, 1605-1605B, 1607. At issue in this case is the FSIA's expropriation exception. That exception waives a foreign state's sovereign immunity in any case in which:

> [1] rights in property taken in violation of international law are in issue and [2.A.] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2.B.] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the

5

foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). The exception thus "has two requirements." *de Csepel v. Republic of Hungary* (*de Csepel IV*), 859 F.3d 1094, 1101 (D.C. Cir. 2017). "A claim satisfies the exception if (1) 'rights in property taken in violation of international law are in issue,' and (2) there is an adequate commercial nexus between the United States and the defendants." *Id.* All agree—and the record reflects—that the property at issue (the family's artwork) is owned by agencies or instrumentalities of Hungary that are sufficiently engaged in commercial activity in the United States. *Id.* at 1104. So only the requirement that defendants have committed a "tak[ing] in violation of international law" is at issue in these appeals.

With respect to whether the FSIA covers the type of takings at issue here, the Supreme Court has held that "the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 187 (2021). Plaintiffs invoking that exception must therefore identify a violation of the international law of expropriation specifically and cannot rest on contravention of other bodies of international law, such as international human rights law. *Id.* at 182. The international law of expropriation referenced in section 1605(a)(3) "incorporates the domestic takings rule," under which a foreign sovereign's taking of its own nationals' property does not implicate the international legal system. *Id.* at 176-80, 187. As a result, *Philipp* generally bars plaintiffs who were nationals of the expropriating state at the time of the alleged taking from invoking the FSIA's expropriation exception to establish jurisdiction in U.S. courts. *See, e.g.*, *Ivanenko v. Yanukovich*, 995 F.3d 232, 237 (D.C. Cir. 2021).

6

In addition to exceptions the statute separately enumerates, 28 U.S.C. §§ 1605-1607, FSIA immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of [the FSIA's] enactment," *id*. § 1604. Thus, "if there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel v. Republic of Hungary* (*de Csepel II*), 714 F.3d 591, 601 (D.C. Cir. 2013) (formatting modified). For a treaty to bar jurisdiction otherwise available under the FSIA, the claims for which jurisdiction is invoked must fall expressly within the treaty's scope. *See id.*

**B.**

We described the historical background of this case in earlier opinions. *See de Csepel II*, 714 F.3d at 594-96; *de Csepel IV*, 859 F.3d at 1097-98; *de Csepel v. Republic of Hungary* (*de Csepel VI*), 27 F.4th 736, 739-41 (D.C. Cir. 2022). For the convenience of the reader, we do so again here, highlighting the most relevant context.

Baron Mór Lipót Herzog was a "passionate Jewish art collector in pre-war Hungary" who had assembled before the war a collection of more than two thousand paintings, sculptures, and other artworks. Am. Compl. ¶ 37 (24-7045 J.A. 301).[1] Known as the "Herzog Collection," that body of artwork was "one of Europe's great private collections of art, and the largest in Hungary," and included works by renowned artists such as El Greco, Velázquez, Renoir, and Monet. *Id*. Following Herzog's death in 1934 and his wife's shortly

---

[1]    References to the appropriate brief or joint appendix are preceded by the relevant case number.

7

thereafter, their daughter Erzsébet and two sons István and András inherited the collection.

Then came World War II and Hungary's alliance with the Axis Powers under Nazi leadership. During the war, Hungary intensified a program of Jewish persecution that had commenced in earnest in the late 1930s. It restricted Jewish employment, prohibited sexual relations between Jews and non-Jews, pressed some Jews into forced labor, and exiled others to territories under German control. Nonetheless, Hungary's Jews "were treated significantly better in comparison to [Jews in] other parts of Nazi-controlled Europe" and consequently became "firmly convinced that they would survive the war under the continued protection" of the Hungarian state. Kende Decl. ¶¶ 13, 15 (24-7045 J.A. 2373-74) (internal quotation marks omitted). That all changed in early 1944, "on the very eve of triumph over the barbarism which their persecution symbolize[d]." Franklin D. Roosevelt, Statement on Opening Frontiers to War Victims and Justice for War Crimes, The American Presidency Project (Mar. 24, 1944). Frustrated by Hungary's "lack of vigor" in persecuting its Jewish population and fearing that the country would defect in the final days of the war from its alliance with Germany, Adolf Hitler sent German troops to occupy the country in March of that year. Kende Decl. ¶ 17 (24-7045 J.A. 2374) (internal quotation marks omitted). Commander Adolf Eichmann of the German paramilitary force Schutzstaffel, or SS, entered the country along with the occupying forces and established headquarters at the Majestic Hotel in Budapest. The occupiers established a pro-Nazi puppet government under Hungarian prime minister Döme Sztójay, who acted under German orders to "solv[e] the Jewish question and supply[] Germany with desperately needed goods." Id. ¶ 22 (J.A. 2376) (internal quotation marks omitted).

8

The arrival of the Germans marked a sharp deterioration in the position of Hungary's Jews. Indeed, "[n]owhere was the Holocaust executed with such speed and ferocity as it was in Hungary." *Simon v. Republic of Hungary* (*Simon I*), 812 F.3d 127, 133 (D.C. Cir. 2016). Between mid-May and mid-July 1944, Hungarian authorities deported over fifty percent of the country's Jewish population. By war's end, most were dead, ninety percent of them having been "murdered upon arrival" at Auschwitz and other death camps. *Simon v. Republic of Hungary* (*Simon II*), 911 F.3d 1172, 1175 (D.C. Cir. 2018). As an integral part of its genocidal program, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets." Am. Compl. ¶ 53 (24-7045 J.A. 305). Jews "were required to register all of their property and valuables" above a certain value, and the Hungarian government "inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews." *Id*. ¶ 54 (24-7045 J.A. 305). "[P]articularly concerned with the retention of artistic treasures belonging to Jews," the Hungarian government established "a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews . . . and required Hungarian Jews promptly to register all art objects in their possession." *Id*. ¶ 55 (24-7045 J.A. 305). "These art treasures were sequestered and collected centrally by the Commission for Art Objects," headed by the director of the Hungarian Museum of Fine Arts. *Id.*

Faced with widespread looting of Jewish property, the Herzogs "attempted to save their art works from damage and confiscation by hiding the bulk of [them] in the cellar of one of the family's factories at Budafok." *Id*. ¶ 57 (24-7045 J.A. 306). Despite the family's efforts, "the Hungarian government and their Nazi[] collaborators discovered the hiding place" and

9

confiscated the artworks. *Id*. ¶ 58 (24-7045 J.A. 306). The collection was "taken directly to Adolf Eichmann's headquarters at the Majestic Hotel in Budapest for his inspection," where he "selected many of the best pieces" for display near Gestapo headquarters and for eventual transport to Germany. *Id*. ¶ 59 (24-7045 J.A. 306). "The remainder was handed over by the Hungarian government to [its] Museum of Fine Arts for safekeeping." *Id*. After the seizure of the collection, a pro-Nazi newspaper ran an article in which the director of the Hungarian Museum of Fine Arts boasted that the "Herzog collection contains treasures the artistic value of which exceeds that of any similar collection in the country. . . . If the state now takes over these treasures, the Museum of Fine Arts will become a collection ranking just behind Madrid." *Id*. ¶ 58 (24-7045 J.A. 306).

"Fearing for their lives, and stripped of their property and livelihoods, the Herzog family was forced to flee Hungary or face extermination." *Id*. ¶ 62 (24-7045 J.A. 307). Erzsébet Herzog (Erzsébet Weiss de Csepel following her marriage) fled Hungary with her children, first reaching Portugal and eventually settling in the United States, where she became a citizen in 1952. István Herzog was nearly sent to Auschwitz but "escaped after his former sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of the Spanish Embassy." *Id*. ¶ 41 (24-7045 J.A. 302). "He died in 1966, leaving his estate to his two sons, Stephan and Péter Herzog, and his second wife, Mária Bertalanffy." *Id*. András Herzog had been "sent . . . into forced labor in 1942 and he died on the Eastern Front in 1943." *Id*. ¶ 40 (24-7045 J.A. 302). His daughters, Julia Alice Herzog and Angela Maria Herzog, fled to Argentina and eventually settled in Italy, where they now live.

10

The seized artworks were dispersed.  Most were never physically returned to the family.  They instead were scattered across Nazi-occupied Europe, shipped back to Hungary after the war, and eventually deposited at the defendant institutions. The artworks that were returned to the Herzog siblings or their families in the years immediately following World War II were soon taken back by the government for various reasons, including a criminal-forfeiture judgment against István's former wife, Ilona Kiss.  In 1973, the United States and Hungary agreed to permanently settle the claims of U.S. nationals regarding expropriations that had occurred as of the date of the agreement.  *See* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, Hung.-U.S., Mar. 6, 1973, 24 U.S.T. 522 (1973 Agreement).

**C.**

After World War II, the Herzog family began a seven-decade effort to reclaim their art collection.  *de Csepel IV*, 859 F.3d at 1098.  They first sued in the Hungarian courts.  *Id*. When those efforts proved unsuccessful, three heirs to the collection—Erzsébet's grandson David L. de Csepel, along with András's daughters Julia Alice and Angela Maria Herzog—filed suit in 2010 in U.S. district court.  Asserting jurisdiction under the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), and commercial activity exception, *id.* § 1605(a)(2), they brought various common-law claims against the Republic of Hungary, three art museums (the Budapest Museum of Fine Arts, the Hungarian National Gallery, and the Budapest Museum of Applied Arts), and the Budapest University of Technology and Economics.  They claimed principally that defendants had "breached certain bailment agreements entered into after World War II when they refused

11

to return pieces of the Herzog Collection upon demand in 2008." *de Csepel v. Republic of Hungary* (*de Csepel I*), 808 F. Supp. 2d 113, 120 (D.D.C. 2011). Plaintiffs alleged that, of the forty-four pieces from the Herzog Collection originally at issue, twenty-four were owned by the heirs of András, twelve by the heirs of Erzsébet, and eight by the heirs of István. *de Csepel v. Republic of Hungary* (*de Csepel III*), 169 F. Supp. 3d 143, 148 (D.D.C. 2016). Forty-two of those artworks were originally seized during the Nazi occupation of Europe, while two were taken during the Communist era. *Id.* The heirs sought imposition of a constructive trust, an accounting, disgorgement, a declaration of their ownership of the Herzog Collection, and, ultimately, either return of the artwork or $100 million in compensation. Compl. pt. V (24-7045 J.A. 83-84).

On Hungary's motion, the district court dismissed claims regarding eleven pieces of artwork on grounds of international comity, *de Csepel I*, 808 F. Supp. 2d at 144-45, but it sustained jurisdiction over the remaining thirty-one under the FSIA's expropriation exception, *id.* at 133. The court reasoned that the domestic-takings bar posed no barrier to suit because Hungary had *de facto* stripped Hungarian Jews of their citizenship and because German Nazi officials had been "active[ly] involv[ed]" in the alleged takings. *Id.* at 129-30. On appeal, we reversed the international-comity dismissal and otherwise affirmed the district court on different grounds. *See de Csepel II*, 714 F.3d at 594, 598. Because the complaint focused on alleged repudiation of bailment agreements with the Hungarian defendants, we held that, regardless of whether the expropriation exception applied, the case fit "comfortably within the FSIA's commercial activity exception." *Id.* at 598-601.

On remand, following discovery, the district court concluded it could no longer sustain jurisdiction under the

12

commercial activity exception but reaffirmed that the expropriation exception applied. *de Csepel III*, 169 F. Supp. 3d at 147. In doing so, it relied on our intervening decision in *Simon I*, 812 F.3d 127, which had concluded that expropriations from Jews during the Holocaust constituted genocidal "takings" in violation of international law that are actionable under the FSIA's expropriation exception, *id.* at 142. *See de Csepel III*, 169 F. Supp. 3d at 163-64. As for the two artworks that were first confiscated years after the Holocaust, however, the district court held that it lacked jurisdiction for fact-bound reasons not relevant to the current appeal. *Id.* at 165-67.

We affirmed in part and reversed in part. *See de Csepel IV*, 859 F.3d at 1097. In the main, we concluded that "[t]his case is just like *Simon* [*I*]," *id.* at 1102, and thus the expropriation exception was appropriate, *id.* at 1102-04. We remanded to the district court for it to reconsider whether the exception applied to the pieces of art returned to the Herzog family after the war but later retaken by Hungary's communist government. *Id.* at 1104-05. Over a partial dissent by Judge Randolph, we also dismissed the Republic of Hungary as a defendant because we read the relevant clause of the expropriation exception's commercial-nexus requirement to support jurisdiction over Hungary's agencies or instrumentalities but not the state itself. *Id.* at 1104-08. And we granted the heirs leave to amend their complaint in light of the Holocaust Expropriated Art Recovery Act of 2016 (HEAR Act), Pub. L. No. 114-308, 130 Stat. 1524, which preempted previous statutes of limitations and instituted a new six-year statute of limitations from the passage of the Act for people seeking recovery of Nazi-confiscated art. *See de Csepel IV*, 859 F.3d at 1109-10.

13

On remand, the heirs amended their complaint to reference the HEAR Act and add previously time-barred conversion claims for wartime takings of the artworks. *See* Am. Compl. ¶¶ 87-98, 109-117 (24-7045 J.A. 312-15, 316-18). The current complaint also adds as a defendant the state-owned corporation Hungarian National Asset Management, Inc. (MNV), which owns and manages certain Hungarian assets, including the artworks at issue in this case. *Id.* ¶¶ 3, 14 (24-7045 J.A. 286, 289).

Hungary responded with a third motion to dismiss. As relevant here, the district court held that it had jurisdiction over claims relating to just five of nineteen pieces of art that had been returned to the Herzogs following the war, including the two pieces that had been retaken by Hungary after their postwar return: József's Borsos's *Portrait of the Architect Mátyás Zitterbarth* (which belonged to András) and Mihály Munkácsy's *In the Studio* (which belonged to Erzsébet). *See de Csepel v. Republic of Hungary* (*de Csepel V*), 613 F. Supp. 3d 255, 286-300 (D.D.C. 2020). The district court certified that order for immediate appellate review under 28 U.S.C. § 1292(b), but we declined to exercise our discretion to review "those fact-bound determinations" at that stage, limiting our review to legal questions of broader import. *de Csepel VI*, 27 F.4th at 753. At the conclusion of that third appeal, therefore, claims regarding sixteen of the original forty-four artworks in the litigation had been dismissed (two in *de Csepel III* and fourteen in *de Csepel V*), leaving twenty-eight pieces in play.

Meanwhile, the Supreme Court decided *Philipp*, which, as noted, held that the FSIA's expropriation exception encompasses only takings in violation of the international law of expropriation—not those contrary to international human-rights law—and thus incorporates the domestic-takings bar. *See* 592 U.S. at 187. In light of *Philipp*, Hungary moved

14

to dismiss for want of FSIA jurisdiction over all "artworks that Hungary took from its own citizens."  Mot. to Dismiss 1 (24-7045 J.A. 2062).  According to defendants, that defect barred the family's claims to twenty-seven of the remaining twenty-eight artworks—all but an early sixteenth-century German sculpture called *Figure of Santa Barbara*, for which there was "some evidence" that it was "seized by [non-Hungarian] officials and removed from Hungary to a salt mine in Bad Ischl, Austria."  *Id.* at 19 (24-7045 J.A. 2080).[2]

After briefing on the motion was complete, we decided *Simon v. Republic of Hungary* (*Simon III*), 77 F.4th 1077 (D.C. Cir. 2023), *vacated on other grounds by Simon IV*, 604 U.S. 115.  In that case, we declined to exercise jurisdiction over an expropriation claim against Hungary brought by plaintiffs who had argued that the domestic-takings bar did not prevent suit because their predecessors—also survivors of the Hungarian Holocaust—had been rendered *de facto* stateless by the time of the taking.  *Id.* at 1097-98.  The district court requested

---

[2]    There is no direct evidence of a wartime taking for three artworks at issue: József Borsos's *Girls with Garlands of Flowers*, Mihály Munkácsy's *The Afternoon Visit*, and *Jewelry Bowl*, attributed to Sebastianus Hann.  Mot. to Dismiss 18-19 (24-7045 J.A. 2079-80); 24-7045 Hungary Br. 14 & n.43.  The heirs asserted below, however, that "documentary evidence" "strongly supports the conclusion that at least two of the artworks" were taken by Hungary during the Nazi occupation.  Opp. 35 (24-7045 J.A. 2272).  They thus argued that these pieces should be treated "in the same manner as the other artworks that were part of the war-time takings," *id.* at 37 (24-7045 J.A. 2274), a contention they renew on appeal, *see* 24-7045 Heirs' Br. 16 & n.6.  The district court appears to have done so, *de Csepel V*, 613 F. Supp. 3d at 286-300, and defendants do not object to that treatment.  We therefore treat these artworks as wartime takings.

15

supplemental briefing on the impact of our *Simon III* decision on plaintiffs' claims.

In the opinion under review in No. 24-7045, the district court granted Hungary's motion to dismiss as to twenty-seven artworks—twenty-five that Hungary took during the Holocaust, and two (*In the Studio* and *Portrait of the Architect*) that Hungary retook later. *de Csepel v. Republic of Hungary* (*de Csepel VII*), 695 F. Supp. 3d 1, 28, 34, 37 (D.D.C. 2023). It first rejected the heirs' attempt to evade the domestic-takings bar by arguing that Germany was actually responsible for the expropriations. The district court held instead that Germany's occupation was not alone enough to render it responsible and that the record did not otherwise show that Germany directed or coerced the takings. *Id.* at 10-28. The court then held that, as in *Simon III*, the plaintiffs had not shown that a state's taking of a *de facto* stateless person's property violates the international law of expropriation. *Id.* at 29-34. Finally, the court accepted the defendants' urging that it reconsider jurisdiction over *In the Studio* and *Portrait of the Architect*, concluding on the available evidence that neither piece fell under the expropriation exception. *Id.* at 34-38. As for the *Santa Barbara*—which evidence indicated German officers had taken—the court instructed the parties to file additional briefing. *Id.* at 38.

In the opinion under review in No. 24-7148, the district court held that it could not exercise jurisdiction over the *Santa Barbara* because "at the time of the FSIA's enactment, the international law of expropriation did not include takings in violation of the international laws of war." *de Csepel v. Republic of Hungary* (*de Csepel VIII*), 752 F. Supp. 3d 147, 160 (D.D.C. 2024). The *Santa Barbara* "was taken, according to plaintiffs, by Nazi officials during Germany's wartime occupation of Hungary," making it a wartime taking for which

16

the heirs could not establish jurisdiction under the expropriation exception. *Id.* at 162. The court held, in the alternative, that based on *forum non conveniens* it would not exercise jurisdiction over the *Santa Barbara* because the parties agreed that an adequate alternative forum was available in Hungary, and the relevant private- and public-interest factors favored litigation there given that the remaining plaintiffs were not American citizens. *Id.* at 162-64.

Plaintiffs timely appealed both decisions.

**II.**

We review the district court's jurisdictional rulings on questions of law *de novo*, *Yanukovich*, 995 F.3d at 236, and its factual determinations for clear error, *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

A plaintiff seeking to sue a foreign sovereign under the FSIA "bears the 'initial burden' of overcoming the Act's 'presumption of immunity' by making out a legally sufficient case that an exception *does* apply in the first place." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 449 (D.C. Cir. 2018) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). To do so under the expropriation exception, a plaintiff must advance a "valid claim that 'property' has been 'taken in violation of international law.' A nonfrivolous argument to that effect is insufficient." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017) (internal citation omitted). Once a plaintiff has adequately shown that the exception applies, "the burden shifts to [the foreign sovereign defendant] to disprove that claim." *Helmerich*, 743 F. App'x at 449.

17

If a defendant challenges "the factual basis of the court's jurisdiction," the court "must go beyond the pleadings and resolve any disputed issues of fact" necessary to adjudicate the motion. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). In such a case, "the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." *Simon I*, 812 F.3d at 147 (internal quotation marks omitted).

## III.

We begin by considering whether we have jurisdiction over the claim for the *Santa Barbara*, as our resolution of that issue affects treatment of the others. Before we address the parties' legal contentions, two preliminary disputes bear mention. First, despite having previously acknowledged that "some evidence" suggested that the *Santa Barbara* had been taken by "non-Hungarian forces," Mot. to Dismiss 19 (24-7045 J.A. 2080), Hungary now asserts that the heirs have not met their factual burden on that score, *see* 24-7148 Hungary Br. 27-29. We disagree. The heirs have met their burden by producing evidence that non-Hungarian officials took that sculpture. *See de Csepel VIII*, 752 F. Supp. 3d at 158. For its part, Hungary points to no evidence—much less a preponderance—showing otherwise. *Cf. Simon I*, 812 F.3d at 147. It has failed to "disprove" the heirs' proffered factual basis for the assertion of jurisdiction. *Helmerich*, 743 F. App'x at 449.

Second, Hungary renews its argument that the heirs should be estopped from relying on their forebears' *de jure* Hungarian nationality to avoid the domestic-takings bar for Germany's taking of the *Santa Barbara* because the heirs elsewhere have maintained that those relatives were rendered *de facto* stateless

18

by the Holocaust.  *See* 24-7148 Hungary Br. 24-26 & nn.5-6. Courts have no occasion to apply the discretionary doctrine of judicial estoppel absent a "clear[] inconsisten[cy]" between a party's earlier and later positions. *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 733 (D.C. Cir. 2019).  As the very terms "*de facto*" and "*de jure*" indicate, there is at least a formal— and potentially legal—distinction between citizens who have been officially denationalized and those who have simply been treated as such.  The heirs' arguments from their forebears' *de facto* statelessness take as a premise that the Herzogs remained *de jure* citizens of Hungary—the very same premise undergirding their jurisdictional arguments as to the *Santa Barbara*.  We therefore conclude that the district court did not abuse its discretion in declining to estop the heirs from relying on their forebears' *de jure* Hungarian nationality.

To determine whether the expropriation exception confers jurisdiction here over plaintiffs' claims regarding the *Santa Barbara*, we "look to the law of property." *Philipp*, 592 U.S. at 180.  The heirs rest their case on section 185 of the Second Restatement of Foreign Relations Law, which lists three independent conditions under which the "taking by a state of property of an alien is wrongful" according to international property law:  lack of public purpose, discrimination with respect to nationality, or absence of just compensation. Restatement (Second) of Foreign Relations Law § 185 (A.L.I. 1965) (Second Restatement).  According to plaintiffs, Germany's plunder of the *Santa Barbara* was an "uncompensated, discriminatory taking of a foreign national's property" and thus squarely implicated one or more of the conditions rendering an international taking wrongful. 24-7148 Heirs' Br. 20.

As the operative Restatement at the time of the FSIA's enactment, the Second Restatement "bears authoritative weight

19

in interpreting the Act." *Simon III*, 77 F.4th at 1097; *see Philipp*, 592 U.S. at 180. Here, however, it cannot satisfy the heirs' burden. As the district court observed, the Second Restatement expressly limits the applicability of its commentary to "times of peace," and it states more than once that "[t]he effect of war or hostilities . . . is beyond the scope of the Restatement of this Subject." Second Restatement pt. IV, Intro. Notes ¶ 1; *see id.* § 34, Reporters' Note 2. Plaintiffs do not dispute—indeed, they assert—that the *Santa Barbara* was taken by Germany during its wartime military occupation of Hungary. *See* 24-7148 Heirs' Br. 9; Oral Arg. Rec. 0:52-1:07, 6:25-53. That sculpture's taking is therefore "beyond the scope" of the very Restatement on which the heirs rely to meet their burden of presenting a "valid claim" that the expropriation exception applies. *Helmerich*, 581 U.S. at 178.

In response, plaintiffs insist that "a taking can[] violate both the international law of war *and* the international law of expropriation." 24-7148 Heirs' Br. 24; *see* 24-7148 Reply Br. 3-13. Even if that is theoretically true, parties must show that the challenged taking violated the international law of expropriation as such, regardless of whether it also violated some other body of law. On that question, the heirs' reliance on the Second Restatement leaves them empty handed. Pressed at oral argument for some source of international law that might support their argument, plaintiffs mentioned only the Hague Convention—itself a codification of the laws of war, not the international law of property. Oral Arg. Rec. 17:47-18:53, 20:16-21:43. A cursory comparison of the two bodies of law, moreover, places in doubt their suggestion that "the same principles apply to the war-time taking of property belonging to aliens" as to peacetime expropriations. 24-7148 Heirs' Br. 22. The Second Restatement permits expropriations during peacetime as long as none of the conditions in section 185 is violated, *see* Second Restatement § 185, whereas the Hague

20

Convention states flatly that "[p]illage is forbidden" and "[p]rivate property cannot be confiscated" during military occupations, Hague Convention No. IV Respecting the Laws and Customs of War on Land, arts. 43, 46-47, Oct. 18, 1907, 36 Stat. 2277.  And even putting aside those incongruities, we could not exercise jurisdiction under the FSIA on the mere supposition that the principles articulated by the Second Restatement might apply to wartime situations, despite its explicit disclaimer that they may not.

Without any source establishing a violation of the international law of expropriation, plaintiffs point to U.S. judicial decisions that they assert have resolved this question in their favor.  If anything, however, the cases show only that this issue has yet to be squarely decided by any court.  The Supreme Court in *Philipp* stated in dicta that "[c]laims concerning Nazi-era art takings could be brought under the expropriation exception where the claims involve the taking of a *foreign* national's property."  592 U.S. at 185.  But that case concerned a 1935 forced art sale in prewar Nazi Germany, so the Court had no occasion to consider the narrower question of wartime Nazi takings.  *See id.* at 174.  The heirs point out that *Philipp* cited the Supreme Court's earlier decision in *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), which concerned a suit brought under the expropriation exception to recover art that Austria had taken from a Czechoslovakian national, *see id.* at 680-82.  *Altmann*, however, concerned only whether the FSIA applies to pre-enactment conduct, *see id.* at 681, not whether wartime takings establish jurisdiction under the expropriation exception.  And while Nazi Germany had originally confiscated that art during its annexation of Austria, the Court was clear that the basis for the expropriation claim— and the locus of the Court's review—was Austria's postwar conduct thwarting the claimant's attempts to reassert ownership of the art, not "the legal validity of title passed

21

through Nazi looting." *Id.* at 706 (Breyer, J., concurring); *see id.* at 683-87, 697 (majority opinion).  Neither *Altmann* nor *Philipp*, therefore, counsels us to accept the heirs' theory of jurisdiction.

Nor do any other authorities brought to our attention support our jurisdiction.  The Supreme Court in *Altmann* reviewed only part of the Ninth Circuit's decision, leaving undisturbed the determination that the expropriation exception applied to the Nazi-era taking.  *See Altmann v. Republic of Austria*, 317 F.3d 954, 968 (9th Cir. 2002).  But no party there asserted that the international law of expropriation is inapplicable to wartime takings, so the Ninth Circuit had no occasion to consider the point.  *See, e.g.*, *id.* (relying on non-wartime precedent invoking the Second Restatement).  Plaintiffs also point to a case from our district court that similarly held that challenges to Nazi wartime takings may proceed under the expropriation exception.  *See Agudas Chasidei Chabad of U.S. v. Russian Federation*, 466 F. Supp. 2d 6, 19-20 (D.D.C. 2006).  That case relied on other district courts' identification of principles of international law.  *See id.* (citing *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187 (C.D. Cal. 2001), and *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000)).  Like *Agudas Chasidei* itself, *see id.* at 15-16, those cases invoked either the Restatement's approach to non-wartime takings, *see Altmann*, 142 F. Supp. 2d at 1202—which we have already explained does not support the heirs' position on wartime takings—or the international law of war, *see Bodner*, 114 F. Supp. 2d at 134, an approach that *Philipp* has since abrogated.  In any event, we did not review that holding on appeal, *see Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 943 (D.C. Cir. 2008), so any contrary conclusion does not bind us.  And *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc), concerned only Germany's *pre*-war confiscation of artwork

22

from plaintiffs' *de jure* stateless Jewish forebears, *see id.* at 1023 & n.2; *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1165-66 (C.D. Cal. 2006); Compl. ¶¶ 21-24, *Cassirer v. Kingdom of Spain*, No. 05-3459 (C.D. Cal. May 10, 2005), ECF No. 1 (alleging that the taking occurred in 1939 shortly before the war began).

Finally, the heirs point to a 1949 State Department press release and various Holocaust-related statutes in support of their general contention that "the United States has long recognized the invalidity of Nazi war time seizures of property." 24-7148 Heirs' Br. 26-29. Each of those statutes, however, was raised in *Philipp*, where the Court held that they "do not speak to sovereign immunity." 592 U.S. at 186. And a State Department letter, however indicative of the stance of the Executive at the time, does not control the jurisdiction of the federal courts—especially when that letter addressed a case involving only the act-of-state doctrine and did not mention foreign sovereign immunity. *See Bernstein v. N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij*, 210 F.2d 375, 375-76 (2d Cir. 1954); *see also First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 764 (1972) (plurality opinion) (referring to the "so-called Bernstein exception to the act of state doctrine"). The heirs, in short, must establish that Congress in the FSIA has authorized federal courts to exercise jurisdiction in circumstances like these, which requires showing that the international law of expropriation reaches them. It is not enough that postwar U.S. policy generally favored restitution for Nazi-era takings.

In holding that the FSIA's expropriation exception incorporates "the international law governing property rights" as such, the Supreme Court approvingly quoted the International Court of Justice, which declared that "a State is not deprived of immunity by reason of the fact that it is accused

23

of serious violations of international human rights law or the international law of armed conflict." *Jurisdictional Immunities of the State (Germany v. Italy)*, *Judgment*, 2012 I.C.J. 99, ¶ 91 (Feb. 3); *see Philipp*, 592 U.S. at 182. The Supreme Court read the expropriation exception more narrowly than we and other lower courts had done, expressly warning against "transforming the expropriation exception into an all-purpose jurisdictional hook for adjudicating human rights violations." *Philipp*, 592 U.S. at 183.

We heed that directive here. Because we conclude that the heirs have not met their burden, we need not decide whether the FSIA's expropriation exception ever establishes jurisdiction over claims of wartime property confiscation. It suffices that the authorities the heirs have presented to the court do not make out a "valid claim," *Helmerich*, 581 U.S. at 178, that wartime takings violate the international law of expropriation. The FSIA's expropriation exception thus does not support jurisdiction over plaintiffs' claims relating to the *Santa Barbara*.

**IV.**

**A.**

The foregoing obviates the need to adjudicate the heirs' theory that Germany, as the occupying power at the time, is legally responsible for all wartime takings of the Herzog Collection, including the twenty-five works for which the available evidence points only to Hungarian involvement. *See* 24-7045 Heirs' Br. 38-52; *de Csepel VII*, 695 F. Supp. 3d at 10-28. Plaintiffs press several versions of that theory on appeal, each of which asks us to avoid the domestic-takings bar by looking beyond the Hungarian actors to attribute responsibility for the takings to Germany. 24-7045 Heirs' Br.

24

42-43.  That analytic step leads to a dead end.  To the extent the heirs succeed on any of their theories of German responsibility, those artworks would then be in the same position as the *Santa Barbara* sculpture *vis-à-vis* the wartime-takings question—as plaintiffs themselves admitted at oral argument.  *See* Oral Arg. Rec. 10:34-12:00.  It would thus make little difference whether plaintiffs could show that Germany was legally responsible for the takings of artworks other than the *Santa Barbara*.  Even assuming that it was, the heirs would run up against the same inability to make out a legally sufficient case that wartime takings fall within the ambit of the expropriation exception.  *See* 24-7045 Hungary Br. 37.

We resolve plaintiffs' German-responsibility theories on this basis even though it was not a ground for dismissal that Hungary pressed before the district court for these artworks.  "[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *U.S. Nat. Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993).  These appeals arise from the same case between the same parties.  The wartime-takings question was extensively litigated before the district court in the related appeal concerning the *Santa Barbara*.  And, to the extent Germany is ultimately responsible for the takings, all the art in question is positioned the same with regard to the relevant legal question.  We therefore do not confront a scenario in which "[e]normous confusion . . . would result" by permitting counsel "to appeal upon points not presented to the court below."  *Keepseagle v. Perdue*, 856 F.3d 1039, 1053-54 (D.C. Cir. 2017) (internal quotation marks omitted).  We see no point in untangling the thicket of state responsibility for takings during a military occupation when a deeper jurisdictional defect bars the claim either way.

25

**B.**

That leaves only the heirs' alternative theory in support of jurisdiction, premised on the asserted *de facto* statelessness of the Herzogs when Hungary took their property. In *Simon III*, we addressed a question left open by *Philipp*: whether descendants of individuals who were rendered *de facto* stateless by the Holocaust can evade the domestic-takings bar on the theory that their forebears should be considered "aliens" for the purposes of the international law of expropriation. 77 F.4th at 1094-98. We held that *Philipp* might accommodate such a theory, *see id.* at 1094-96, but we nonetheless concluded that the plaintiffs had not demonstrated that such a theory had "jelled into a binding rule of customary international law," *id.* at 1098. The *Simon III* plaintiffs had relied on the fact that the term "alien" in the Second Restatement denotes both foreign nationals and stateless persons "for purposes of the responsibility of a state for injury" to an individual, Second Restatement § 171, thus seeming to encompass stateless persons within international expropriations law. But, we noted, the Second Restatement also provides that stateless aliens are "without remedy" under international law for takings claims against an expropriating state, with certain exceptions not relevant to the case. *Simon III*, 77 F.4th at 1097-98 (quoting Second Restatement § 175 cmt. d). And we found no support in the plaintiffs' secondary sources for the contention that the taking of a *de facto* stateless person's property is otherwise a remediable violation of the international law of expropriation. *See id.* at 1098.

The heirs aim to pick up where the *Simon III* plaintiffs left off. Rather than identify new "sources of international law not before us" in that case, *id.*, they also rely on the Second Restatement and instead argue that neither it nor the FSIA "mandates that the injured party have a particular international

26

law remedy available at the time of the taking in order for the conduct at issue to be wrongful and constitute a violation of international law." 24-7045 Heirs' Br. 34. We may assume, like the district court, that Hungary's persecution of the Herzogs indeed rendered them *de facto* stateless, *see de Csepel VII*, 695 F. Supp. 3d at 31; 24-7045 Heirs' Br. 29; *see also Simon III*, 77 F.4th at 1097 (taking this approach), and proceed to examine whether that fact would enable plaintiffs to establish jurisdiction.

Even if plaintiffs' interpretation of the Second Restatement is correct, their exclusive reliance on it nonetheless leaves them shorthanded once again. For one, they fail to show that the Second Restatement refers to *de facto*, rather than only *de jure*, stateless persons. As the district court explained and Hungary argues here, if the Second Restatement refers only to persons officially denaturalized, then it provides no support for the contention that *de facto* stateless persons constitute a distinct category of alien protected by international law. *See de Csepel VII*, 695 F. Supp. 3d at 33 n.20; 24-7045 Hungary Br. 38-39. In the absence of authority for distinct international-law protection as *de facto* stateless, plaintiffs retain their *de jure* Hungarian nationality so presumably would be subject to the domestic-takings bar. Plaintiffs never address this lacuna in their argument, instead relying on a district court case involving only *de jure* denationalization. *See* 24-7045 Heirs' Br. 37 (citing *Ambar v. Federal Republic of Germany*, 596 F. Supp. 3d 76, 84 (D.D.C. 2022)). The Second Restatement, ambiguous on this point, does not support the conclusion that the heirs' position had "crystallized into an international norm that bears the heft of customary law." *Helmerich*, 743 F. App'x at 449.

Assuming, moreover, that the Second Restatement could plausibly be interpreted to refer to *de facto* stateless persons,

27

"its pronouncements are useful only if they flow from sources of positive law such as judicial authority or reasoned scholarly commentary." *Id.* at 453. Plaintiffs point to no source of international law supporting their interpretation of the Second Restatement. Conversely, many such sources posit that the opposite rule flows from the fact that international law treats a state's injury to an alien as, ordinarily, an injury to the alien's *state* rather than to the alien herself. *See Philipp*, 592 U.S. at 176-77; *Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545, 551 (11th Cir. 2015) (agreeing with Fifth Circuit that "injuries to individuals have been cognizable only where they implicate two or more different nations" (formatting altered)). That conceptualization poses a difficult problem for those who, like plaintiffs, would premise a violation of international law on their forebears' statelessness.

Early in the last century, renowned international-law theorist L.F.L. Oppenheim reported that "stateless individuals . . . lack any protection whatever as far as" international law is concerned because, by dint of having no nationality, "the link by which they could derive benefits from" that law "is missing." 1 Oppenheim, *International Law: A Treatise* § 312 (2d ed. 1912). Thus, "as a point of international legality there is no restriction whatever upon a State's maltreating them to any extent." *Id.* His 1955 update to that treatise restated that basic principle, while noting the important exception of human-rights law. *Id.* (8th ed. 1955). So, too, a seminal 1931 claims-commission arbitral decision observed that a state "does not commit an international delinquency in inflicting an injury upon an individual lacking nationality." *Dickson Car Wheel Co. (U.S.A.) v. United Mexican States*, 4 R.I.A.A. 669, 678 (Mex.-U.S. Gen. Claim Comm'n, July 1931). And modern scholars have written that, "in general, stateless persons cannot be classified as or treated like aliens." Kay Hailbronner & Jana Gogolin, *Aliens*, Max Planck

28

Encyclopedias of International Law, ¶ 3 (July 2013).  As one commentator puts it, the "substantive guarantees of the law of aliens developed hand-in-hand with the exercise of diplomatic protection, which, at least from a historical perspective, referred only to *nationals of other states*."  Sebastián Mantilla Blanco, *Full Protection and Security in International Investment Law* 172 (2019).

Tellingly, the Third Restatement of Foreign Relations Law entirely abandons the language on statelessness in its predecessor Restatement that provided a potential opening for plaintiffs.  The Third Restatement clarifies that the international law of expropriation protects only "a national of another state" or a "foreign national," Restatement (Third) of Foreign Relations Law, § 712 & cmt. a (1987), and "provide[s] no protection for persons who have no nationality," *id.* § 713 cmt. d.  Instead, it notes, such persons are covered by "general human rights law."  *Id.*  As the Supreme Court has made clear, however, the expropriation exception is not concerned with violations of international human-rights law.  *Philipp*, 592 U.S. at 180.  That customary international law has come to protect the human rights of stateless persons as *individuals* does not mean that the international law of property, as a branch of the law of nations, extends to them similar protections.  *See* Blanco, *supra*, at 175-76 (making this point).  And, as *Philipp* itself pointed out, even international human-rights law itself traditionally remained "silent . . . on the subject of property rights."  592 U.S. at 178.  The heirs' references to various human-rights treaties that protect the rights of stateless persons, *see* 24-7045 Reply Br. 12-13, are therefore beside the point.

In sum, the heirs have not met their burden to show that we may exercise jurisdiction over these claims on the basis of the FSIA's expropriation exception.  *Philipp* requires us to look only to the international law of property to identify the legal

29

violation for purposes of the expropriation exception.  We have seen no evidence of that body of law's accommodating the claims of those who, *de facto* or otherwise, belong to no state.

## C.

That leaves only two remaining claims: the postwar retakings of *In the Studio* and *Portrait of the Architect*.  The district court had earlier sustained jurisdiction over the heirs' claims to these pieces in *de Csepel V*, 613 F. Supp. 3d at 289, 300, but, in one of the decisions on appeal before us (*de Csepel VII*), the district court reconsidered that determination at Hungary's urging and reversed, *see* 695 F. Supp. 3d at 34-37.  The heirs object to that reconsideration, arguing that there was no basis for it and that the evidence supports the continued exercise of jurisdiction.

Assessing these claims requires a fair bit of background on each painting and the basis for the earlier determinations.  Recall that Hungary regained possession of several pieces of art in the postwar years as part of a criminal forfeiture.  *See supra* Section I.B.  In *de Csepel V*, the district court held that those pieces were taken as part of the Hungarian government's criminal proceeding against István's ex-wife Ilona Kiss for attempting to smuggle the artworks out of Hungary, and therefore that any connection to their Holocaust-era taking was "severed."  613 F. Supp. 3d at 288.  But five of the pieces had apparently been forfeited to Hungary by mistake, according to a March 1951 letter from the then-director of the Museum of Fine Arts, who requested termination of the criminal attachment.  *Id.* at 288-89; *see* No. 10-1261, ECF No. 106-6 at ECF p. 38 (letter).  Although no evidence demonstrated whether the requested termination occurred, the court reasoned that it could not conclude that those five pieces—still in defendants' possession—actually passed to the state in 1950 as

30

part of the forfeiture, rather than at some later point in time for unknown reasons.

That ambiguity mattered because one of these pieces, *Portrait of the Architect*, belonged to András, whose heirs eventually became Italian citizens—so a later taking from Italian heirs might avoid the domestic-takings bar. *de Csepel V*, 613 F. Supp. 3d at 289. For that piece, the court relied on a December 1973 letter from the Hungarian Ministry of Culture that asserted that all of the pieces in the Kiss forfeiture, "insofar [as] they ha[d] not already passed into the ownership of the State," had become state property. *Id.* Because András's daughters were by then Italian citizens and no other evidence indicated when *Portrait of the Architect* was taken, the district court apparently dated the taking to December 1973 and concluded that it was "an expropriation in violation of international law over which the Court has jurisdiction." *Id.*

As for *In the Studio*, a piece that belonged to Erzsébet (who became a U.S. citizen), the district court noted in *de Csepel V* that the piece had apparently been deposited with the Museum of Fine Arts in the 1950s and was mentioned in a May 10, 1966, letter to that museum from a state political department asking whether it and several other artworks were indeed in the museum's possession. The Museum of Fine Arts' response did not confirm its possession of *In the Studio*. *Id.* at 299-300. And, while the December 1973 letter from the Ministry of Culture listed the piece as having passed to the Hungarian state by virtue of the 1973 Agreement settling claims with U.S. citizens, the court observed that as of 2020 the artwork was still listed as "on deposit" with the Museum, suggesting that at that point it had not yet been taken. *Id.* at 300. Because "any taking after 1973 would be a taking in violation of international law *not* settled by the 1973 Agreement," the court retained jurisdiction over *In the Studio*. *Id*.

31

In their motion to dismiss takings claims as to twenty-seven of the remaining artworks, defendants challenged *de Csepel V*'s determinations in that regard, *see* Mot. to Dismiss 11 n.4 (24-7045 J.A. 2072), which the district court treated as a request for reconsideration, *see de Csepel VII*, 695 F. Supp. 3d at 34-35. An order denying sovereign immunity is interlocutory, *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 22 (D.C. Cir. 2024), and the district court may reconsider an interlocutory order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities," Fed R. Civ. P. 54(b); *see Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997); *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982). In the FSIA context, we have further explained that a district court's conclusion that it may exercise jurisdiction over a foreign sovereign "is not a conclusive determination but is instead subject to change in light of further development of the facts." *Price*, 389 F.3d at 197 (internal quotation marks and citations omitted); *see also Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 699 (D.C. Cir. 2022) (law-of-the-case doctrine does not require or permit ignoring jurisdictional defects). On appeal, the court's legal conclusions are subject to *de novo* review and its findings of fact are reviewed for clear error. *Wye Oak Tech.*, 24 F.4th at 700.

We see no clear error in the district court's determination that it could no longer exercise jurisdiction over either of these two pieces. As for *Portrait of the Architect*, the court relied on a May 1951 letter—not discussed in *de Csepel V*—that states that the painting was by that date "transferred to the ownership of the Museum." *de Csepel VII*, 695 F. Supp. 3d at 35-36; *see* May 8, 1951 Letter (24-7045 J.A. 2106). Plaintiffs complain that the May letter itself relies on a document that predates the March 1951 letter requesting termination of the criminal attachment, and it is thus not proof that the termination request

32

was not later granted and the painting returned.  24-7045 Heirs' Br. 54-55.  But the court did not clearly err in determining that documentary evidence plainly indicating that ownership had "transferred" by May 1951 trumped plaintiffs' conjecture that the painting was somehow later returned in response to the March 1951 letter and then retaken after András's daughters became Italian citizens.

Nor did the court clearly err in concluding that *In the Studio* was likely taken when it would have been subject to the 1973 Agreement settling all claims of U.S. nationals for pre-1973 takings.  Indeed, the Hungarian government listed the piece as one of the artworks covered by that agreement, *see de Csepel VII*, 695 F. Supp. 3d at 36; *de Csepel V*, 613 F. Supp. 3d at 300, and the court reasonably credited that clear documentary proof of transfer over an assertion by plaintiffs' expert that the piece was still "on deposit" with defendants, *see* No. 10-1261, ECF No. 148-2 (Scholl-Tatevosyan Decl.) at ECF pp. 12-13 & n.4.  In addition, Erzsébet had sought compensation for the painting in 1959 from an earlier claims commission set up by the United States, and her claim was "approved and paid in full."  *de Csepel VII*, 695 F. Supp. 3d at 36.  Under U.S. law, determinations of that earlier commission are "final and conclusive on all questions of law and fact and not subject to review by any other official of the United States or by any court by mandamus or otherwise."  22 U.S.C. § 1641m.  The fact that Erzsébet successfully claimed *In the Studio* as taken by that point means, from the perspective of U.S. courts, that it has been finally determined that the painting was taken as of 1959—regardless of what other evidence might suggest.  That, in turn, means that the remaining claims based on that painting are either subject to the 1973 Agreement or, if the painting was taken before Erzsébet became a U.S. citizen, barred by the domestic-takings bar.  In either case, we may not exercise jurisdiction over them.

33

## V.

For the foregoing reasons, we affirm the district court's dismissals of the family's claims in its 2023 and 2024 decisions and thus affirm the dismissal of the *de Csepel* litigation in its entirety. We do so cognizant that our ruling will be a disappointment to a family that has spent decades seeking redress for the plunder of its property. The Herzogs were innocent victims of war and genocide, some of the millions of people for whom no measure of justice has ever been granted. Their family heirlooms now hang on the walls of public institutions in Hungary that, to date, have shown no real interest in atoning for the depredations of that country's World War II−era government. The only question we face today, however, is not whether these plaintiffs deserve justice—they surely do—but whether Congress has granted U.S. courts the jurisdiction to provide it. As explained above, it has not. Unless and until it does, the responsibility for redressing such historic wrongs must lie elsewhere.

*So ordered.*