# United States Court of Appeals for the District of Columbia Circuit

## Nos. 24-7045 (Consolidated with 24-7148)

DAVID L. DE CSEPEL; ANGELA MARIA HERZOG; JULIA ALICE HERZOG,

*Plaintiffs-Appellants,*

*v.*

REPUBLIC OF HUNGARY, a foreign state; HUNGARIAN NATIONAL GALLERY; MUSEUM OF FINE ARTS; MUSEUM OF APPLIED ARTS; BUDAPEST UNIVERSITY OF TECHNOLOGY AND ECONOMICS; MAGYAR NEMZETI VAGYONKEZEL ZRT., MNV or Hungarian National Asset Management Inc. in English,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:10-cv-01261-JDB, John D. Bates, U.S. Senior District Judge*

## RESPONSE OF DEFENDANTS-APPELLEES IN OPPOSITION TO APPELLANTS' MOTION TO VACATE THE PANEL DECISION AND REMAND, OR ALTERNATIVELY FOR SUPPLEMENTAL BRIEF, AND TO WITHHOLD THE MANDATE

THADDEUS J. STAUBER
AARON M. BRIAN
ZACHARY C. OSINSKI
Nixon Peabody LLP
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071
(213) 629-6000
tstauber@nixonpeabody.com
abrian@nixonpeabody.com
zosinski@nixonpeabody.com

May 18, 2026

*Counsel for Defendants-Appellees*

CP COUNSEL PRESS  (800) 4-APPEAL • (714520)

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 4

    A.    Vacatur and Remand Without Instructions Is the Proper Disposition in Light of the New Statute ............................................... 4

    B.    The HEAR Act of 2025 Raises Substantial Questions of Statutory Interpretation, Application and Constitutionality ................ 6

        1.    The Presumption Against Extraterritoriality Constrains Application of the 2025 HEAR Act ........................................... 6

        2.    Retroactive Application of the HEAR Act Cannot Strip Defendants of Their Vested Property Rights ........................... 11

        3.    The 2025 HEAR Act Violates Article III ............................... 14

        4.    The HEAR Act Cannot Expand FSIA Jurisdiction ................. 15

        5.    The 2025 HEAR Act's Apparent Removal of Doctrines Key to Maintaining Foreign Relations May Lead to Non-Enforcement of U.S. Judgments ............................................ 18

    C.    The New Statute Does Not Impact the Panel's Dismissal of Claims for Two Artworks ................................................................ 19

CONCLUSION ................................................................................................ 20

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)................................................................. 15-16

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016).....................................................................15

*Barkanic v. GeneralAdmin. of Civ. Aviation of the People's Republic of China,*
923 F.2d 957, 960 (2d Cir. 1991)) ...............................................13

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
581 U.S. 170 (2017).....................................................................18

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
153 F.Supp.3d 1148 (C.D. Cal. 2015) ...................................... 11-12

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107, 114 (2022)................................................................8

*Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*,
111 F.4th 12 (D.C. Cir. 2024)........................................................6

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)................................................................. 9-10

*Fed. Republic of Germany v. Philipp*,
592 U.S. 169, 141 S. Ct. 703 (2021)............................................6, 17

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993).....................................................................10

*Lauritzen v. Larsen*,
345 U.S. 571 (1953).....................................................................13

*Lawrence v. Chater*,
516 U.S. 163 (1996)....................................................................4, 5

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................7

*Murray v. Schooner Charming Betsy, The*,
    6 U.S. 64, 2 L. Ed. 208 (1804) ..............................................................7

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50, 58 (1982) ........................................................................14

*RJR Nabisco v. Eur. Cmty.*,
    579 U.S. 325 (2016) ...................................................................6, 7, 8, 11

*Stern v. Marshall*,
    564 U.S. 462 (2011) ............................................................................14

*Thorpe v. Housing Authority of City of Durham*,
    393 U.S. 268 (1969) ..............................................................................4

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) ............................................................8

*United States v. Schooner Peggy*,
    5 U.S. (1 Cranch) 103 (1801) ............................................................4, 5

**Statutes**

28 U.S.C. § 1604 ...........................................................................................16

28 U.S.C. § 1605(a)(3) .......................................................................1, 2, 3, 4, 5

28 U.S.C. § 1605A ........................................................................................17

28 U.S.C. § 1606 ...........................................................................................12

Holocaust Expropriated Art Recovery Act of 2016, 130 Stat. 1526,
    Public Law 114–308 (Dec. 16, 2016) ..............................................5, 9

Holocaust Expropriated Art Recovery Act of 2025, 140 Stat. 752,
    Public Law 119-82 (Apr. 13, 2026) ...........................2, 3, 5, 6, 8, 9, 10, 11, 12,
    14, 15, 17, 18, 20

Holocaust Victims Redress Act, Pub. L. 105-158, § 201(5) ....................................9

**Other Authorities**

Federal Rule Appellate Procedure 27(a)(3) ................................................1

Federal Rule Appellate Procedure 27(a)(3)(B) ......................................1, 3

H.R. REP. 94-1487, 1976 U.S.C.C.A.N. 6604 .................................16, 17

The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton) ...............14, 15

*Brief of the United States as Amicus Curiae Supporting Petitioners* in
*Cassirer v. Thyssen-Bornemisza Collection Foundation*, 2021 WL
5513717 (Nov. 21, 2021) ................................................................13

State Department Memorandum on Enforcement of Judgments ...........................19

Washington Conference Principles on Nazi Confiscated Art (1998) ......................7

2009 Terezin Declaration on Holocaust Era Assets and Related Issues ...................9

*Developments in the Law—Extraterritoriality,* 124 Harv. L.Rev. 1226,
1280 (2011) ....................................................................................7

Pursuant to Federal Rule Appellate Procedure 27(a)(3), Defendants-Appellees the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, the Budapest University of Technology and Economics, and Magyar Nemzeti Vagyonkezelő Zrt. ("Defendants") submit the following response to Plaintiffs-Appellants' motion.

Pursuant to Rule 27(a)(3)(B), Defendants separately move to preserve the Panel's unanimous decision affirming dismissal of claims for *In the Studio* and *Portrait of the Architect Matyas Zitterbarth*. The new statute which is the basis for Plaintiffs' motion to vacate does not affect the Panel's ruling on the claims for these paintings, and that ruling should not be remanded for further consideration.

## INTRODUCTION

Plaintiffs filed this action claiming ownership of forty-four artworks, once part of the Herzog art collection, which have been in Defendants' possession and on public display in Budapest for approximately fifty to seventy years. As a result of earlier proceedings, Plaintiffs' claims for sixteen (16) of these artworks were dismissed. As it relates to this consolidated appeal, the district court dismissed Plaintiffs' claims for the remaining twenty-eight (28) artworks for lack of jurisdiction under the Foreign Sovereign Immunity Act's ("FSIA") expropriation exception, 28 U.S.C. § 1605(a)(3) and/or *forum non conveniens*. The panel unanimously affirmed the dismissal on January 23, 2026, holding that Plaintiffs

1

failed to establish that wartime takings or takings from stateless persons violate the international law of expropriation as required by § 1605(a)(3). Plaintiffs filed petitions for rehearing *en banc* on February 23, 2026, which remain pending.

In the interim, the U.S. Senate passed the Holocaust Expropriated Art Recovery Act of 2025 (the "2025 HEAR Act") on December 10, 2025. The House passed the 2025 HEAR Act on March 16, 2026, and it was signed into law by the President on April 13, 2026. On its face, the 2025 HEAR Act specially modified the FSIA's expropriation exception—deeming any taking covered by section (a) of the HEAR Act sufficient to create jurisdiction under that exception—and removed certain defenses and legal doctrines from consideration. In light of the 2025 HEAR Act, Plaintiffs moved to vacate the panel's decision and remand the matter to the district court for further consideration with instructions or, alternatively, for supplemental briefing before this Court.

Defendants do not oppose vacatur and remand to the district court for further consideration as to claims for twenty-six (26) of the artworks at issue. However, Defendants oppose Plaintiffs' request that this Court remand with instructions directing the district court to find that jurisdiction under 28 U.S.C. § 1605(a)(3) is established. Defendants also oppose Plaintiffs' alternative request for supplemental briefing.

Defendants will challenge the enforceability, interpretation, and application of the 2025 HEAR Act on several grounds, including but not limited to: (1) the presumption against extraterritoriality, (2) whether the Act violates Article III separation of powers, (3) the violation of Defendants' due process rights, (4) whether amendments to the Act can expand FSIA jurisdiction, and (5) the Act's elimination of international comity and other norms of international law, without which U.S. judgments may be disregarded in foreign jurisdictions. These questions, and the overall constitutionality of the 2025 HEAR Act, have not been addressed by any court and are not amenable to resolution here. The district court is the proper forum for first-instance adjudication of these issues on a fully developed record.

Separately, pursuant to Rule 27(a)(3)(B), Defendants move the Court to preserve dismissal of two artworks— *In the Studio* and *Portrait of the Architect Matyas Zitterbarth*—which were returned to the Plaintiffs' family after the war, then re-taken outside the relevant period, and are thus unaffected by the new statute. The dismissal of claims for those two paintings should not be disturbed and those claims should not be remanded for further proceedings. Rather, the Court should issue its mandate as to Plaintiffs' claims for these two artworks.

**ARGUMENT**

**A. Vacatur and Remand Without Instructions Is the Proper Disposition in Light of the New Statute**

Under established Supreme Court precedent, when "subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied." *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801); *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281–82 (1969). Where a new statute materially alters the legal framework on which a decision rests, the ordinary disposition is vacatur and remand for further proceedings in light of the changed law. *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam). The Panel's decision rested on the domestic takings rule as incorporated into § 1605(a)(3), and on the conclusion that wartime takings were not cognizable under the international law of expropriation. As a result, the takings did not satisfy the requirements of the expropriation exception, and there was no basis for jurisdiction over claims to recover the subject artworks.

The HEAR Act of 2025 purports to override both holdings by permitting jurisdiction over any claim covered by section 5(a) of the HEAR Act "without regard to the nationality or citizenship of the alleged victim."  Section 5(a) of the HEAR Act covers claims for "any artwork or other property that was lost" from January 1,

4

1933 to December 31, 1945 "because of Nazi persecution." 130 Stat. 1526, Public Law 114–308 (Dec. 16, 2016).

But this statutory change alone does not establish jurisdiction under the expropriation exception (*see* 28 U.S.C. 1605(a)(3)), and the district court must still determine whether that exception's requirements are satisfied. The panel's jurisdictional analysis was governed by the pre-2025 HEAR Act legal framework, the Amended Complaint has not been answered, and a potentially applicable new statute has been passed. The proper course is remand to determine if the expropriation exception provides jurisdiction over these defendants in this action.

The additional instructions that Plaintiffs requested are unnecessary and inappropriate. The *Schooner Peggy/Lawrence* standard requires only that the lower court have the opportunity to reconsider in light of the new law—it does not dictate what the lower court must conclude. The proper scope and application of the 2025 HEAR Act is a threshold question that the district court should decide in the first instance on a fully developed record and with the benefit of further briefing under the new statutory framework. The district court has not yet had the opportunity to consider the 2025 HEAR Act. Where, as here, an intervening development changes the governing legal standard, the proper course is remand to the district court for application of the new standard in the first instance, not resolution at the appellate level on an undeveloped record. *Lawrence*, 516 U.S. at 166-167; *see also, e.g.,*

*Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 35, 37 (D.C. Cir. 2024) (remand to district court for further factual development).

Moreover, as discussed below, significant issues remain as to the proper interpretation and application of the 2025 HEAR Act, which must be resolved before any further decisions on jurisdiction are reached. Even if the review of a decision on subject matter jurisdiction is *de novo*, an appellate court should not issue instructions directing a particular outcome on remand where the intervening statute raises substantial unresolved questions that were not briefed or decided below. *See*, *e.g.*, *Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 187 (2021) (vacating and remanding for lower courts to address arguments in the first instance).

## B. The HEAR Act of 2025 Raises Substantial Questions of Statutory Interpretation, Application and Constitutionality

Defendants will challenge the 2025 HEAR Act on numerous grounds, and further proceedings at the district court are necessary to determine the appropriate scope and application of the new statute. A brief summary of some issues Defendants will raise is included here.

### 1. The Presumption Against Extraterritoriality Constrains Application of the 2025 HEAR Act

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco v. Eur. Cmty.*, 579

U.S. 325, 335 (2016) (citations omitted). Moreover, "the practice of using international law to limit the extraterritorial reach of statutes is firmly established in our jurisprudence." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 818 (1993) (Scalia, J., dissenting) (citing federal case law tempering the extraterritorial application of federal statutes); see also *Murray v. Schooner Charming Betsy, The*, 6 U.S. 64, 118, 2 L. Ed. 208 (1804) ("It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

Flowing from these well-established principles, the presumption against extraterritoriality holds that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335. The presumption "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries [and] reflects the more prosaic commonsense notion that Congress generally legislates with domestic concerns in mind." *Id*., at 335-336 (cleaned up).

This principle is critical. Here, the property has never been in the United States, the takings occurred in Hungary, and the prior owners were Hungarian nationals. Indeed, some plaintiffs are foreign residents today—meaning a foreign plaintiff is suing a foreign entity over property located in a foreign country. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 283, n.11 (2010) (Stevens, J.,

7

concurring in judgment) (noting that in "foreign-cubed" actions "the odds of the fraud having a substantial connection to the United States are low" and that "it might have been appropriate to incorporate one bright line into the Second Circuit's test, by categorically excluding such lawsuits from [Securities Exchange Act] § 10(b)'s ambit"); *RJR Nabisco*, 579 U.S. at 363 (2016) (Breyer, J., concurring) (noting RICO does not apply to "foreign-cubed" litigation). Because the 2025 HEAR Act lacks a clear statement of extraterritorial intent, it must be interpreted as "territorially limited." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1351 (D.C. Cir. 2004) (Rogers, J., dissenting).

Moreover, despite the heightened importance of choice of law analysis in FSIA cases, *see Cassirer*, *supra*, (596 U.S. 107), the HEAR Act is silent on choice of law. The Act also states that "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law"—language carried over unchanged from the 2016 HEAR Act. Finally, the first stated purpose of both the 2016 and 2025 HEAR Acts is to ensure that laws governing claims to Nazi-confiscated art further U.S. policy as "set forth in the Washington Principles on Nazi Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." All three sources emphasize respect for differing legal systems and international law. *See* Washington Conference Principles ("the Conference recognizes that among participating nations there are differing legal systems and that countries act within

8

the context of their own laws"); Holocaust Victims Redress Act, Pub. L. 105-158, § 201(5) ("the same international legal principles applied among states should be applied to art and other assets stolen from victims of the Holocaust"); 2009 Terezin Declaration on Holocaust Era Assets and Related Issues, Nazi-Confiscated and Looted Art, par. 3 ("while taking into account the different legal traditions").

Respect for foreign substantive law is thus integrated into the HEAR Act. Accordingly, the statute must be interpreted with these constraints in mind, and the presumption against extraterritoriality must apply. A choice of law analysis will thus determine what substantive law governs:

> "[I]n the absence of a contrary congressional direction," [courts apply] "principles of choice of law that are consonant with the needs of a general federal maritime law and with due recognition of our self-regarding respect for the relevant interests of foreign nations[.]" "The controlling considerations" are "the interacting interests of the United States and of foreign countries."

*Hartford Fire Ins.*, 509 U.S. at 815 (Scalia, J., dissenting) (quoting *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382-83 (1959)).

Here, although the parties fully briefed the choice of law test in the court below, the motion to apply Hungarian law was denied without prejudice when the district court dismissed the case for lack of jurisdiction. Upon remand, that issue must be resolved. And if Hungarian substantive law applies, then any reading of the 2025 HEAR Act that conflicts with, or otherwise displaces, Hungarian substantive law must be set aside. *See, e.g., F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542

U.S. 155, 165 (2004) (concluding that America's antitrust laws cannot be read to govern foreign conduct and asking, rhetorically, "Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?").

Moreover, because the HEAR Act is primarily procedural and does not define the defenses it purports to eliminate—including adverse possession and laches—it creates vagueness and ambiguity when foreign law applies. The Act's silence on choice of law exacerbates this problem, as do translation difficulties and fundamental differences between code-based legal systems (where adverse possession is a substantive property right) and common law systems. If the choice of law test results in application of Hungarian law—as Defendants contend—then Hungarian law provides the rule of decision for substantive property rights. But what if the applicable law is French, Indian or Chinese: Would the outcome differ due to translation or legal system issues? Absent a clear statement of extraterritorial intent or workable definitions of foreign legal concepts, the Act cannot be read in this case to selectively displace elements of Hungarian or any other foreign law. The HEAR Act's purported elimination of certain defenses must therefore be read to apply only when American substantive law provides the rule of decision.

Defendants will move in the court below for a reading of the 2025 HEAR Act that does not violate international law and "does not rule the world." *RJR Nabisco*, 579 U.S. at 335.

**2. Retroactive Application of the HEAR Act Cannot Strip Defendants of Their Vested Property Rights**

Pursuant to Hungarian substantive property law, Defendants have vested ownership interests in the subject artworks. This is not mere speculation. In a case brought by Martha Nierenberg in Hungary to recover some of the same artworks at issue here, the Hungarian court determined after eight years of litigation that the defendant institutions acquired lawful ownership under Hungarian law on several grounds. That case was decided in 2008. Martha Nierenberg is the aunt of David de Csepel, plaintiff in this action. Four of the artworks at issue in the Nierenberg litigation were also sought in this action, which was filed two years after Ms. Nierenberg lost her case in Hungary.

To the extent Plaintiffs argue the 2025 HEAR Act *retroactively* precludes application of Hungarian property law, that argument fails on multiple grounds. First, as discussed above, the presumption against extraterritoriality bars it. Second, stripping Defendants of a vested property interest without due process is unconstitutional. See *Cassirer v. Thyssen-Bornemisza Collection Found.*, 153

F.Supp.3d 1148, 1167 (C.D. Cal. 2015), rev'd and remanded on other grounds, 862 F.3d 951 (9th Cir. 2017).

Defendants hold due process rights as foreign-state instrumentalities, *id.*, which is reinforced by Section 1606 of the FSIA, which mandates that a foreign state "be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. The Supreme Court has confirmed what this means:

> So when a foreign state is not immune from suit, it is subject to the same rules of liability as a private party. Which is just to say that ***the substantive law applying to the latter also applies to the former*** . . . . The provision thus ensures that a foreign state, if found ineligible for immunity, ***must answer for its conduct just as any other actor would.***

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 114 (2022) (cleaned up) (emphasis added). Under Section 1606, the Supreme Court held that the same choice of law rules that apply to private parties must also apply to foreign-state defendants. *Id.* at 115. The Solicitor General agreed, explaining that any rule of decision that might affect liability must apply equally to private parties and foreign states:

> [U]sing the same choice of law rules in suits against foreign states that would be applied against private defendants is the only way to "ensure identity of liability" between a foreign state and a private individual.

12

*Brief of the United States as Amicus Curiae Supporting Petitioners* in *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 2021 WL 5513717, at \*14-15 (Nov. 21, 2021) (quoting *Barkanic v. GeneralAdmin. of Civ. Aviation of the People's Republic of China,* 923 F.2d 957, 960 (2d Cir. 1991)).

Denying Defendants the due process protections that are available to private litigants would violate Section 1606's mandate of equal treatment. Those protections could impact whether and to what extent Defendants are liable. The Solicitor General has furthermore recognized that constitutional safeguards—including the Due Process Clause, Full Faith and Credit Clause, and Commerce Clause—apply in FSIA cases. *Amicus Curiae* in *Cassirer*, at \*21-22.

In addition, it has long been held that U.S. "attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state" is a denial of due process. *Lauritzen v. Larsen*, 345 U.S. 571, 590–91 (1953) (citing cases). "The purpose of a conflict-of-laws doctrine is to assure that a case will be treated n [sic] the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum." *Lauritzen*, 345 U.S. at 591. The court in Lauritzen held: "we can find no justification for interpreting the Jones Act to intervene between foreigners and their own law because of acts on a foreign ship not in our waters." *Id*. at 593.

Using the HEAR Act to force application of American law on this otherwise entirely foreign controversy, and then retroactively stripping the Defendants' vested property rights by removing substantive provisions of Hungarian property law, would violate Defendants' due process rights twice over. Neither violation is permitted, and Defendants will move the court below to ensure their due process rights are not so violated.

### 3. The 2025 HEAR Act Violates Article III

Article III "mandates that '[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.'" *Stern v. Marshall*, 564 U.S. 462, 482 (2011) (quoting Article III, § 1, Constitution). Article III is an "inseparable element of the constitutional system of checks and balances" that "'both defines the power and protects the independence of the Judicial Branch.'" *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion). The Framers considered it essential that "the judiciary remains truly distinct from both the legislature and the Executive," The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton), and believed "'there is no liberty, if the power of judging be not separated from the legislative and executive powers.'" *Id.* (quoting 1 Montesquieu, Spirit of Laws 181).

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803). A statute that removes all defenses a party has previously used to defend an action, so as to pre-ordain the outcome regardless of the facts, violates the separation of powers. As Chief Justice Roberts warned, such a law "violates the separation of powers … [n]o less than if [Congress] had passed a law saying 'respondents win[.]'" *Bank Markazi v. Peterson*, 578 U.S. 212, 237 (2016) (Roberts, C.J., dissenting). Plaintiffs will argue for such a reading of the HEAR Act, having signaled already that it removes international comity for this select group of cases. (Motion, at 17).

The 2025 HEAR Act cannot be applied to dictate outcomes regardless of the facts. The court must be permitted to fulfill its exclusive function to interpret the law. The Act's retroactive expansion of jurisdiction, removal of defenses and equitable principles, and modifications of substantive property law test the limits of Congress's authority to intervene in judicial decision-making. Whether the HEAR Act violates Article III should be decided by the district court in the first instance, without the instructions Plaintiffs request.

### 4. The HEAR Act Cannot Expand FSIA Jurisdiction

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping*

*Corp.*, 488 U.S. 428, 443 (1989). The FSIA became law in 1976 only after an incredible amount of work and input from numerous stakeholders:

> H.R. 11315 is the product of many years of work by the Department of State and Justice, in consultation with members of the bar and the academic community. Study of possible legislation began in the mid-1960's. In the early 1970's, a number of draft bills were prepared and submitted for comment to many authorities and practitioners in the international law field. On January 31, 1973, a bill (H.R. 3493) was introduced in the 93d Congress, and referred to the Committee on the Judiciary. The bill H.R. 3493 was the subject of a subcommittee hearing on June 7, 1973. Although extensive advice had already been obtained from the private sector, in the course of the subcommittee's consideration it became apparent that a few segments of the private bar had not been fully consulted. It was pointed out that the 93d Congress bill contained some technical deficiencies which could be remedied-- particularly with respect to maritime cases and the jurisdictional provisions. The American Bar Association at the August 1976 meeting of its House of Delegates adopted a resolution urging approval of H.R. 11315. The letter of that association indicating its support is set out at the end of this report.

H.R. REP. 94-1487, 9-10, 1976 U.S.C.C.A.N. 6604, 6608.

The result was a law which held that, subject to existing international agreements, "a foreign state shall be immune from the jurisdiction of the courts of the United States and the States except as provided in sections 1605 to 1607." 28 U.S.C. 1604. The legislative history made clear:

> The FSIA "sets forth **the sole and exclusive standards** to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States. It is intended **to preempt any other State or Federal law** (excluding applicable international agreements) for according immunity to foreign sovereigns," and "prescribes … the jurisdiction of U.S. district courts in cases involving foreign states[.]"

H.R. REP. 94-1487, 12, 1976 U.S.C.C.A.N. 6604, 6610 (emphasis added); *see also Argentine Republic*, 488 U.S. at 435, n.3 (same).

Under this law, the expropriation exception required a violation of international law, specifically the international law of expropriation. *Philipp*, 592 U.S. at 187. Congress has not changed this requirement and the language still reads the same. Plaintiffs rely instead on amendments to the HEAR Act, an expiring procedural law. Rather than amending the FSIA directly—as Congress did when it added the terrorism exception (§ 1605A)—an ill-fitting provision was included with the 2025 HEAR Act which purports to expand the expropriation exception and rewrite international law for a subset of claims. Even under Plaintiffs' reading, the domestic takings rule and other crystallized aspects of international law continue to apply to all other claims brought under the expropriation exception.

Defendants are agencies or instrumentalities of a foreign sovereign and as such are presumably immune from suit in the U.S. The FSIA is the *only* source of jurisdiction over the Defendants. Whether the 2025 HEAR Act can selectively, and partially, override FSIA's jurisdictional requirements is a question of first instance and should be resolved by the court below on full briefing.

**5. The 2025 HEAR Act's Apparent Removal of Doctrines Key to Maintaining Foreign Relations May Lead to Non-Enforcement of U.S. Judgments**

In amending an otherwise procedural law that established a statute of limitations, Congress not only expanded jurisdiction over foreign sovereigns for a select category of claims, retroactively making it easier to hale foreign sovereigns and their agencies and instrumentalities into U.S. court, but simultaneously declared that the act of state doctrine, international comity, and forum non conveniens would not apply to any such case. Historically, these doctrines have served as essential protections for foreign sovereigns when party to U.S. litigation.

This is especially relevant in our legal system, which already had a more liberal approach to foreign sovereign immunity than most other nations. Despite this more liberal approach, "a basic objective of the FSIA"—the only source of jurisdiction over foreign sovereigns and their agencies and instrumentalities—"is to follow international law principles, namely, that granting foreign sovereigns immunity from suit both recognizes the 'absolute independence of every sovereign authority' and helps to 'induc[e]' each nation state, as a matter of 'international comity,' to 'respect the independence and dignity of every other[.]'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 171 (2017) (quoting *Berizzi Brothers Co. v. S.S. Pesaro*, 271 U.S. 562, 575 (1926)).

Removing doctrines meant to safeguard respect for other nations—including comity, forum non conveniens, and act of state—will interfere with broader foreign relations and could erode foreign courts' willingness to enforce U.S. judgments. The U.S. State Department has identified the importance of comity in having U.S. judgments enforced by foreign courts: "In consequence, absent a treaty, whether the courts of a foreign country would enforce a judgment issued by a court in the United States depends upon the internal laws of the foreign country and international comity."[1]

**C. The New Statute Does Not Impact the Panel's Dismissal of Claims for Two Artworks**

The district court dismissed Plaintiffs' claims for *In the Studio* and *Portrait of the Architect Matyas Zitterbarth* for lack of jurisdiction under FSIA's expropriation exception. In affirming dismissal, the panel detailed the factual predicate for those claims. (Opinion, 29-32). The panel noted these claims were based on "postwar retakings" and that "Hungary regained possession of several pieces of art in the postwar years as part of a criminal forfeiture." (Opinion, 29). In any event, the two paintings at issue, *In the Studio* and *Portrait of the Architect Matyas Zitterbarth*, were retaken in 1950, at the earliest. (Opinion, 29-30). Because the 2025 HEAR

---

[1] *See*, State Department Memorandum on Enforcement of Judgments, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judgements.html

Act's expansion of the expropriation exception applies only to artworks lost between January 1, 1933 and December 31, 1945, the specially expanded expropriation exception does not cover claims for these paintings.

Accordingly, the legal framework supporting dismissal of these two claims for lack of jurisdiction remains unchanged, and there is no basis to vacate the dismissal or remand these two claims. Plaintiffs' petitions for rehearing do not mention either artwork, and offer no explanation as to why the panel's ruling on these two claims was incorrect. The Court should not vacate the ruling on these claims or remand them for further consideration in light of the 2025 HEAR Act. The Court should instead issue its mandate as to these two claims.

## CONCLUSION

For the reasons stated above, Defendants ask the Court to vacate the panel's ruling as to twenty-six of the twenty-eight artworks and remand claims for those artworks, without instructions, to the district court for further proceedings. Significant threshold questions remain that should be resolved by the district court on full briefing.

The Defendants separately move the Court to issue its mandate as to Plaintiffs' claims for *In the Studio* and *Portrait of the Architect Matyas Zitterbarth*, as the Court still lacks jurisdiction over claims to those artworks.

20

Respectfully submitted,

*/s/ Aaron M. Brian*
NIXON PEABODY LLP
Thaddeus J. Stauber
Aaron M. Brian
Zachary C. Osinski
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Telephone: (213) 629-6076
Facsimile: (866) 231-3048
tstauber@nixonpeabody.com
abrian@nixonpeabody.com
zosinski@nixonpeabody.com

***Counsel for Defendants/Appellees Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics***

# CERTIFICATE OF COMPLIANCE

1. This document complies with this Court's type-volume limitation because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), this document contains 4,628 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman.

Dated: May 18, 2026  Respectfully submitted,

*/s/ Aaron M. Brian*
NIXON PEABODY LLP
Thaddeus J. Stauber
Aaron M. Brian
Zachary C. Osinski
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Telephone: (213) 629-6076
Facsimile: (866) 231-3048
tstauber@nixonpeabody.com
abrian@nixonpeabody.com
zosinski@nixonpeabody.com

***Counsel for Defendants/Appellees Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics***